In re ASIA GLOBAL CROSSING, LTD., et al., Debtors.

Nos. 02 B 15749(SMB), 02 B 15750(SMB).

United States Bankruptcy Court, S.D. New York.

March 21, 2005.

---

Golenbock, Eiseman, Assor, Bell & Peskoe LLP, Jonathan L. Flaxer, Esq., David J. Eiseman, Esq., Adam C. Silverstein, Esq., Andrea B. Schwartz, Esq., of Counsel, New York, NY, Attorneys for the Chapter 7 Trustee.

Bryan Cave LLP, Robert A. Wolf, Esq., James M. Altman, Esq., of Counsel, New York, NY, Special Litigation Counsel for the Chapter 7 Trustee.

Hennigan, Bennett & Dorman LLP, Jeanne E. Irving, Esq., of Counsel, Los Angeles, CA, Hennigan, Bennett & Dorman LLP, A. Brent Truitt, Esq., of Counsel, New York, NY, Attorneys for John M. Scanlon, Stefan Riesenfeld, Charles F. Carroll, Monte Baier and Scott Ballantyne.

Stroock & Stroock & Lavan LLP, Kenneth Pasquale, Esq., of Counsel, New York, NY, Attorneys for Janet Troxell.

## MEMORANDUM DECISION AND ORDER REGARDING WAIVER OF PRIVILEGES

STUART M. BERNSTEIN, Chief Judge.

E-mails are a widespread method of communication, and employees sometimes use the employer's e-mail system to communicate with third parties about personal matters. The main question raised by the current motion is whether an employee's use of the company e-mail system to communicate with his personal attorney destroys the attorney-client, work product or joint defense privileges in the e-mails where the employee and his former employer's trustee have become adversaries.

Assuming a communication is otherwise privileged, the use of the company's e-mail system does not, without more, destroy the privilege. Furthermore, except for the Troxell Documents described below, the disputed or incomplete factual record prevents the Court from deciding as a matter of law that a waiver of any privileges occurred.

## BACKGROUND

At all relevant times prior to bankruptcy, Asia Global Crossing, Ltd. and Asia

Global Crossing Development Co. (collectively "Asia Global" or the "debtor") were pan-Asian telecommunications carriers. The following five individuals (the "Insiders") served as the principal officers of Asia Global:[1]

| Office | Officer |
| --- | --- |
| Chief Executive Officer | John M. Scanlon |
| Chief Financial Officer | Stefan Riesenfeld |
| Vice President and General Counsel | Charles F. Carroll |
| Vice President and General Manager of Business Operations | Scott Ballantyne |
| Assistant General Counsel | Monte Baier |

Asia Global filed a chapter 11 petition on November 17, 2002. The case was converted to chapter 7 on June 10, 2003, and Robert L. Geltzer was appointed to act as chapter 7 trustee.

## A. The Documents at Issue

Scanlon learned about the Trustee's appointment while he was out of town and away from the debtor's corporate offices. He telephoned the Trustee, and asked what Asia Global management should do. He was instructed to transfer Asia Global's cash to the Trustee, leave the California offices, lock the doors and send the Trustee the keys. (*Scanlon Declaration*, at ¶ 7.) Scanlon relayed the Trustee's instructions to the other members of Asia Global's management. He never returned to Asia Global's offices after his telephone call with the Trustee. (*Id.*)

In July 2003, Jeanne E. Irving, Esq., of Hennigan, Bennett & Dorman LLP, counsel to the Insiders, learned that certain e-mail messages containing allegedly privileged attorney-client communications were left behind on the Asia Global e-mail servers (the "Insider E-mails"). (*See Declaration of Jeanne E. Irving in Opposition to Trustee's Motion Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Compel Production of Documents*, dated November 1, 2004 ("*Irving Declaration*"), at ¶ 2.)(ECF Doc. # 486.) Irving promptly asked the Trustee's counsel, Golenbock Eiseman Assor Bell & Peskoe LLP ("Golenbock"), to keep the Insider E-mails confidential. (*Id.* at ¶ 3.) At some point between July 2003 and September 2004, Irving learned that the Insiders had also left behind certain allegedly privileged hard copy documents (the "Hard Copy Documents"). (*Id.*, at ¶¶ 2, 21.) These were subsequently segregated and have been held with the Insider E-mails.

## B. The Trustee's Investigation of the Insiders

Following his appointment, the Trustee began an investigation into certain transactions involving the Insiders. After obtaining orders pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "2004 Orders"), the Trustee caused *subpoenas duces tecum* to be served in July 2004 on the Insiders and Janet Troxell.[2] Troxell had done human resources and payroll work for Asia Global, first as an employee, and after March 2002, as a "consultant." (*Irving Declaration*, at Ex. A.)[3] Each of the 2004 Orders and corresponding *subpoenas duces tecum* called for the production of

---

**1.** *See Declarations of John M. Scanlon, Stefan Riesenfeld, Charles F. Carroll, Scott Ballantyne, and Monte Baier in Opposition to Trustee's Motion Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Compel Production of Documents*, dated November 1, 2004 (ECF Doc. ## 487–91).

**2.** The Trustee served the Insiders through counsel, and served Troxell personally.

**3.** Exhibit A to the Irving Declaration contains an extract of the reporter's transcript for the Bankruptcy Rule 2004 examination of Troxell conducted on September 14, 2004.

all documents that relate to the Debtors' acts, conduct, property, liabilities and/or financial condition of the Debtors and/or any other matters which may affect the administration of the Debtors' estates, including, without limitation, all correspondence, memoranda, and all other documents, electronic records, and other media.

Troxell produced certain documents in response to the *subpoena*. However, she withheld twenty pages (the "Troxell Documents") at the Insiders' request on the grounds that the Troxell Documents were covered by the attorney-client and work product privileges. (*See Declaration of Kenneth Pasquale in Response to Trustee's Motion Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Compel Production of Documents Being Withheld from the Trustee by John Scanlon, Charles F. Carroll, Scott Ballantyne, Stefan Riesenfeld, Monte Baier and Janet Troxell,* dated Nov. 1, 2004, at ¶ 3)(ECF Doc. # 483.)

The Insiders apparently did not comply with the July 2004 *subpoenas;* in any event, they failed to produce the Insider E-mails and Hard Copy Documents that had been segregated and remained confidential. As a result, the Trustee issued a second set of *subpoenas* on October 15, 2004. These *subpoenas* specifically called for the production of any electronic documents generated or received on Asia Global computer systems, and any hard copy documents located at the Asia Global offices at the time of conversion to chapter 7. The second set of *subpoenas* was also served on counsel rather than personally on the Insiders. The Insiders again refused to produce the documents, contending, *inter alia,* that they were covered by

the attorney-client, work product and joint defense privileges. (*Declaration of Robert A. Wolf in Support of Trustee's Motion to Compel Production of Documents,* dated October 22, 2004 (the *"Wolf Declaration "*), at Ex. 7.)(ECF Doc. # 479.) [4]

## C. This Motion

As a result, the Trustee moved to compel production of the withheld documents. He contends that the use of the corporate e-mail system waived any privileges that otherwise existed. According to the Trustee, Asia Global maintained a corporate policy that warned e-mail users that the e-mails were the debtor's property, the e-mail system was not secure, that third-parties had access to the e-mail system, and that no one was authorized to use the e-mail system to transmit confidential or secret information. During oral argument, the Trustee expanded his contention, asserting that even without the e-mail policy, the mere use of the company's e-mail system destroyed or waived any privilege. In response, the Insiders emphatically deny the existence of any e-mail policy regarding use or monitoring, or that they were ever advised of such a policy.

The Trustee devotes little attention to the Hard Copy Documents. He simply states that "[s]imilar principles [as those that purportedly eliminated any privilege in the Insider E-mails] render unprivileged any hard copies of communications between the Insiders and their counsel that were maintained at [Asia Global's] offices and abandoned there by the Insiders after they left the company." (*Declaration of Adam C. Silverstein in Support of Trustee's Motion to Compel Production of Documents,* dated October 22, 2004

---

4. The Insiders also provided a privilege log covering the Insider E-mails and Hard Copy Documents. (*Wolf Declaration,* at Ex. 8.) They did not, however, prepare a privilege log for the Troxell Documents.

("*Silverstein Declaration*"), at ¶ 21 (ECF Doc. # 478); *Wolf Declaration,* at ¶ 18.) The Trustee made no separate argument regarding the Hard Copy Documents.

Finally, the Trustee contends that the Insiders waived any privilege in the Troxell Documents for the reason that they were sent to Troxell, a third party. The Insiders' disagree, asserting that they merely passed on their counsel's otherwise privileged request for information, and the communication remains privileged. Troxell, they maintain, was a business associate of the Insiders, and they needed her help in getting information necessary for the provision of legal services. (*Irving Declaration,* at ¶ 31.) [5]

## DISCUSSION

The Trustee's motion impliedly assumes that the documents at issue are otherwise privileged. Instead, he focuses, respectively, on the use of the Asia Global e-mail system, the arguable abandonment of the Hard Copy Documents and the dissemination of the Troxell Documents, and maintains that any privileges have been destroyed. Accordingly, the Court will also assume for the purpose of the instant dispute that the documents are otherwise privileged, but recognizes that this may be disputed in later proceedings.

### A. Choice of Law

■ A threshold issue in this dispute concerns whether state or federal law ap-

plies to the question of the attorney-client privilege. The Federal Rules of Evidence apply in cases under the Bankruptcy Code. Fed. R. Bankr.P. 9017; Fed.R.Evid. 1101(b). Federal Rule of Evidence 501 states that the federal common law of privileges applies when federal law determines the substantive rights of the parties. *Accord United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). On the other hand, the state privilege law controls if the underlying claim or defense is also governed by state law. Fed.R.Evid. 501; *Bower v. Weisman,* 669 F.Supp. 602, 603 (S.D.N.Y.1987).

The parties disagree over the applicable privilege rules. The Insiders contend that state privilege law should apply because the claims that the Trustee is likely to pursue arise under state law. In particular, the Insiders filed proofs of claim asserting contractual rights to employment-related compensation owed by Asia Global. Furthermore, the Trustee commenced actions against some of the Insiders that, *inter alia,* assert claims under California State law.

■ Even if the Trustee ultimately intends to pursue state law claims, federal law nonetheless controls the privilege. The privilege question arose in the context of the Court's Rule 2004 orders and corresponding subpoenas. An examination under Rule 2004 "is nonadversarial in nature [and] aimed at discovering evidence upon

---

**5.** The Insiders also challenged the service of the October 2004 *subpoenas,* but the Trustee did not reply to the argument. Although this challenge is not the subject of this opinion, it would appear to lack merit. The Trustee never obtained a second 2004 Order. Hence, production of the documents at issue must be required under the original *subpoenas* if at all. The Insiders did not object to the service of the original *subpoenas* (which were also served on counsel rather than personally on the Insiders). Thus, it appears that they

waived any objection to service. *See* Fed. R.Civ.P. 45(c)(2)(B)(requiring objections to the production of documents to be made within 14 days after service of the *subpoena* or within the time specified for compliance if such time is less than 14 days after service); *Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 48 (S.D.N.Y.1996)(failure to serve written objections to a *subpoena* within the time specified by Rule 45(c)(2)(B) typically constitutes a waiver of such objections).

which future causes of action may be based and is therefore governed by bankruptcy law rather than state substantive law." Hon. Barry Russell, Bankruptcy Evidence Manual § 501.3, at 826 (2004 ed.)("Russell"). Accordingly, where a *subpoena duces tecum* issues pursuant to Rule 2004, the federal common law rules of privilege apply. *Id.; In re Bakalis*, 199 B.R. 443, 448 (Bankr.E.D.N.Y.1996); *In re Blier Cedar Co.*, 10 B.R. 993, 998 (Bankr.D.Me., 1981).

## B. The Federal Common Law of Attorney–Client Privilege

### 1. Background

■ Under federal law, "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client," between the client and the client's lawyer (or certain representatives of the client and the lawyer). Sup.Ct. Standard 503.[6] The attorney-client privilege "belongs to the client, and only the client can waive it." *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, No. 90–5052–PHX–GBN, 1996 WL 529399, at *3 (Bankr.S.D.N.Y. May 30, 1996).

■■ The privilege must be narrowly construed. It "stands in derogation of the public's 'right to every man's evidence,' and as 'an obstacle to the investigation of the truth.' " *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.)(internal citations omitted), *cert. denied* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). The person asserting the privilege has the burden of proving that the communication is privileged, *id.* at 82, and that the privilege was not waived. *Denney v. Jenkens & Gilchrist*, No. 03 Civ. 5460, 2004 WL 2712200, at *3 (S.D.N.Y. Nov. 23, 2004).

■ The attorney-client privilege applies only to a confidential communication. Sup.Ct. Standard 503(b).

A communication is confidential when the circumstances indicate that it was not intended to be disclosed to third persons other than (1) those to whom disclosure is in furtherance of the rendition of legal services to the client, or (2) those reasonably necessary for the transmission of the communication.

3 Weinstein § 503.15, at 503–57; *accord* Sup.Ct. Standard 503(a)(4).

■ Confidentiality has both a subjective and objective component; the communication must be given in confidence, and the client must *reasonably* understand it to be so given. *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir.1989); *see Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir.2003)("To determine if a particular communication is confidential and protected by the attorney-client privilege, the privilege holder must prove the communication was '(1) intended to remain confidential *and* (2) under the circumstances, was *reasonably* expected and understood to be confidential.' ")(quoting *United States v. Bell*, 776 F.2d 965, 971 (11th Cir.1985)(emphasis in original)); *United States v. Melvin*, 650 F.2d 641, 645 (5th Cir.1981)("A communication is protected by the attorney-client privilege ... if it is intended to remain confidential and was

---

**6.** Proposed Rule 503, and the other privilege standards, were not adopted as part of the Federal Rules of Evidence. They were, however, promulgated by the Supreme Court of the United States, and together with the accompanying advisory committee notes, "should be regarded as an authoritative source of the principles of [federal] common law." Russell, at § 501.2, at 798; *accord* 3 Hon. Jack B. Weinstein, *et al.*, Weinstein's Federal Evidence § 503.02, at 503–10 (2nd ed. 2004)("Weinstein").

made under circumstances that it was reasonably expected and understood to be confidential.")

### 2. The Use of E–Mail

The main gist of the current dispute concerns the confidentiality of e-mail communications. Although e-mail communication, like any other form of communication, carries the risk of unauthorized disclosure, the prevailing view is that lawyers and clients may communicate confidential information through unencrypted e-mail with a reasonable expectation of confidentiality and privacy. *E.g.,* ABCNY Formal Op.2000–1, 2000 WL 704689 (January, 2000); ABA Formal Ethics Op. 99–413 (March 10, 1999); NYSBA Eth. Op. 709, 1998 WL 957924 (September 16, 1998); *see City of Reno v. Reno Police Protective Ass'n,* 118 Nev. 889, 59 P.3d 1212, 1218 (2002); *see generally* Audrey Jordan, Note, *Does Unencrypted E–Mail Protect Client Confidentiality?,* 27 Am. J. Trial Advoc. 623, 626 n. 25 (Spring 2004)(referencing ethical opinions from twenty-three State bar associations).

■ Consistent with this trend, New York and California have enacted laws that provide some protection to e-mail communications. New York C.P.L.R. § 4548 (McKinney 1999) states that a privileged communication does not lose its privileged character for the sole reason that it was sent by e-mail or because persons necessary for the delivery or facilitation of the e-mail may have access to its content. *Accord* Cal. Evid.Code § 917(b) (West 2004). Accordingly, while disagreement exists, *see* NYSBA Eth. Op. 709, 1998 WL 957924 (September 16, 1998)(citing opinions), the transmission of a privileged communication through unencrypted e-mail does not, without more, destroy the privilege.

Asia Global maintained its own e-mail system, and the Insider E-mails were sent over that system. Ordinarily, e-mail communications between agents of a corporation regarding the corporation's business are protected from disclosure to third parties outside the corporation. It is reasonable in those circumstances for the sender to assume that the recipient will hold the communication in confidence. *See Long v. Anderson University,* 204 F.R.D. 129, 134 (S.D.Ind.2001); *City of Reno v. Reno Police Protective Ass'n,* 118 Nev. 889, 59 P.3d 1212, 1218–19 (2002).

The present case, however, does not involve e-mails between corporate agents involving company business. The Insiders used the debtor's e-mail system to communicate with their personal attorney, and the communications apparently concerned actual or potential disputes with the debtor, the owner of the e-mail system. The Court's own research has not located any decisions that discuss the confidentiality of the employee's e-mails in terms of the attorney-client privilege. Several courts have, however, addressed the analogous question of the employee's expectation of privacy in his office computer and the company e-mail system. These cases offer guidance, and are discussed in the next section.

### 3. The Right to Privacy

A right of privacy is recognized under both the common law, *see* RESTATEMENT (SECOND) OF TORTS 652B (1977)(discussing the tort of "intrusion on seclusion"), and the Fourth Amendment to the United States Constitution. In both cases, the aggrieved party must show a reasonable expectation of privacy. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)("[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has

been invaded by government action."); *Kline v. Security Guards, Inc.*, 386 F.3d 246, 260 (3d Cir.2004)(plaintiff asserting cause of action for invasion of privacy under RESTATEMENT (SECOND) OF TORTS 652B must show "reasonable expectation of privacy.")

■■■■ As with attorney-client confidentiality, the expectation of privacy has objective and subjective components. For Fourth Amendment purposes, the person asserting the right must demonstrate that he has "a subjective expectation of privacy . . . that society accepts as objectively reasonable." *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *accord United States v, Simons*, 206 F.3d 392, 398 (4th Cir.2000). Similarly, one claiming an "intrusion on seclusion" must show, *inter alia,* a subjective expectation of privacy and that the expectation is objectively reasonable. *See Medical Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 812 (9th Cir.2002).

### 4. Privacy in the Workplace

■■■■ An employee's expectation of privacy in his office, desk and files "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor v. Ortega*, 480 U.S. 709, 717, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). In light of the variety of work environments, whether the employee has a reasonable expectation of privacy must be decided on a case-by-case basis. *Id.* at 718, 107 S.Ct. 1492.

In *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), a state hospital commenced an investigation into suspected improprieties by its chief of professional education (Ortega). In the course of the investigation, hospital personnel searched Ortega's office without his knowledge or consent. *Id.* at 713, 107 S.Ct. 1492. Following his discharge, Ortega commenced a federal action under 42 U.S.C. § 1983, alleging that the search of his office violated the Fourth Amendment.

The Supreme Court held that although some hospital personnel may have had a legitimate right of access to his office, Ortega had a reasonable expectation of privacy in his desk and file cabinets. He did not share his desk or file cabinets with other employees. He occupied the same office for seventeen years and kept personal items and records in his office. Finally,

> there was no evidence that the Hospital had established any reasonable regulation or policy discouraging employees such as Dr. Ortega from storing personal papers and effects in their desks or file cabinets, . . . although the absence of such a policy does not create an expectation of privacy where it would not otherwise exist.

*Id.* at 719, 107 S.Ct. 1492 (emphasis in original).

■■■ The same considerations have been adapted to measure the employee's expectation of privacy in his computer files and e-mail. In general, a court should consider four factors: (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails [7], and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies? *Compare United States v. Simons*, 206 F.3d 392, 398 & n. 8 (4th Cir.2000)(no reasonable expectation of privacy in office computer and downloaded Internet files where

---

**7.** An employee may take precautions to limit access; offices can be locked, computers can be password-protected, and e-mails can be encrypted.

employer had a policy of auditing employee's use of the Internet, and the employee did not assert that he was unaware of or had not consented to the policy); *Muick v. Glenayre Elec.*, 280 F.3d 741, 743 (7th Cir.2002)(no reasonable expectation of privacy in workplace computer files where employer had announced that he could inspect the computer); *Thygeson v. U.S. Bancorp,* No. CV–03–467, 2004 WL 2066746, at *20 (D.Or. Sept. 15, 2004)(no reasonable expectation of privacy in computer files and e-mail where employee handbook explicitly warned of employer's right to monitor files and e-mail); *Kelleher v. City of Reading,* No. Civ. A. 01–3386, 2002 WL 1067442, at *8 (E.D.Pa. May 29, 2002)(no reasonable expectation of privacy in workplace e-mail where employer's guidelines "explicitly informed employees that there was no such expectation of privacy"); *Garrity v. John Hancock Mutual Life Ins. Co.,* No. Civ. A. 00–12143, 2002 WL 974676, at *1–2 (D.Mass. May 7, 2002)(no reasonable expectation of privacy where, despite the fact that the employee created a password to limit access, the company periodically reminded employees that the company e-mail policy prohibited certain uses, the e-mail system belonged to the company, although the company did not intentionally inspect e-mail usage, it might do so where there were business or legal reasons to do so, and the plaintiff assumed her e-mails might be forwarded to others) *with Leventhal v. Knapek,* 266 F.3d 64, 74 (2d Cir.2001)(employee had reasonable expectation of privacy in contents of workplace computer where the employee had a private office and exclusive use of his desk, filing cabinets and computers, the employer did not have a general practice of routinely searching office computers, and had not "placed [the plaintiff] on notice that he should have no expectation of privacy in the contents of his office computer"); *United States v. Slanina,* 283

F.3d 670, 676–77 (5th Cir.)(employee had reasonable expectation of privacy in his computer and files where the computer was maintained in a closed, locked office, the employee had installed passwords to limit access, and the employer "did not disseminate any policy that prevented the storage of personal information on city computers and also did not inform its employees that computer usage and internet access would be monitored"), *vacated on other grounds,* 537 U.S. 802, 123 S.Ct. 69, 154 L.Ed.2d 3 (2002); *Haynes v. Office of the Attorney General,* 298 F.Supp.2d 1154, 1161–62 (D.Kan.2003)(employee had reasonable expectation of privacy in private computer files, despite computer screen warning that there shall be no expectation of privacy in using employer's computer system, where employees were allowed to use computers for private communications, were advised that unauthorized access to user's e-mail was prohibited, employees were given passwords to prevent access by others and no evidence was offered to show that the employer ever monitored private files or employee e-mails). *But see Smyth v. Pillsbury Co.,* 914 F.Supp. 97, 101 (E.D.Pa.1996)(no reasonable expectation of privacy where employee voluntarily sends an e-mail over the employer's e-mail system).

### 5. The Insider E-mails

■ As noted earlier, the Court assumes that the Insider E-mails are otherwise privileged, and further, that the Insiders subjectively intended that they be confidential. Thus, the question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable. There is a close correlation between the objectively reasonable expectation of privacy and the objective reasonableness of the intent that a communication between a lawyer and a client was

given in confidence. Accordingly, the objective reasonableness of that intent will depend on the company's e-mail policies regarding use and monitoring, its access to the e-mail system, and the notice provided to the employees.

### a. Access

The question of access is addressed first because it is the easiest. Asia Global clearly had access to its own servers and any other part of the system where e-mail messages were stored; otherwise, the Trustee, the debtor's successor, could not have acquired the e-mail communications that the Insiders want to protect. E-mail systems, in this regard, are different from office computers or hard copy files. Asia Global did not require access to the Insiders' offices or their office computers to read their e-mails.[8] In truth, sending a message over the debtor's e-mail system was like placing a copy of that message in the company files. Short of encryption, the Insider E-mails could be reviewed and read by anyone with lawful access to the system.

### b. Limitations on Use and the Intent to Monitor

The evidence is equivocal regarding the existence or notice of corporate policies banning certain uses or monitoring employee e-mails. Charles Carroll, the debtor's former general counsel, emphatically stated that Asia Global did not enact or enforce a policy that e-mails on the compa-

ny server belonged to the company, and he never told anyone that Asia Global had such a policy. (*Carroll Declaration*, at ¶ 3.) He understood that company policy permitted personal use of the e-mail system, (*id.*, at ¶ 4), he never told employees that their e-mails would be monitored, and he did not monitor any employee's e-mail. (*Id.*, at ¶ 5.) Each of the Insiders submitted nearly identical declarations containing similar statements. (*Scanlon Declaration*, at ¶¶ 1–4; *Ballantyne Declaration*, at ¶¶ 1–4; *Riesenfeld Declaration*, at ¶¶ 1–4; *Baier Declaration*, at ¶¶ 1–4.)

The Trustee disputes these assertions, and has identified two e-mail policies that, he argues, directly contradict them.[9] First, according to a document entitled "Corporate E-mail Policy,"

> The Corporate E-mail systems, and ALL data and information transmitted through [the Corporate E-mail systems] are owned and operated by the Corporation for the sole purpose of conducting the Corporation's business.
>
> Incidental and occasional personal use of E-mail is permitted, but such messages are property of the Corporation, and are treated no differently than any other message.
>
> ... *Communications on the Corporate E-mail systems are not private or secure.* Persons with legitimate business purposes have access to all communications on those systems and there is a risk that E-mail communications may be

---

8. According to their declarations, each of the Insiders had a private office and password-protected computers.

9. The relevant e-mail policies are attached to the *Wolf Declaration* as Exhibit 6. A third policy, also attached and entitled Global Crossing's Ethics Policy, is irrelevant. Assuming that it even applied to Asia Global, the Ethics Policy does not address the general privacy concerns of employees using corpo-

rate e-mail. Rather, it deals with limitations on the release of corporate proprietary information through e-mail. Toward that end, "Global Crossing reserves the right, ... to monitor and record the unauthorized release of corporate proprietary information." A fourth policy, entitled "Global Crossing Acceptable Use Policy," appears to be limited to Global Crossing.

accessible to unauthorized users outside the Corporation. No employee of the Corporation is authorized to utilize the E-mail systems for the transmission of confidential or secret information. (Emphasis added.)

Second, a "Messaging Policy" states:

... Authorized users shall access messaging systems solely for the purposes of conducting the Corporation's business, or for other appropriate activities authorized by management. The Corporation ... reserves the right ... to [e]ngage in random or scheduled monitoring of business communications.... *Privacy of these messaging systems is not guaranteed, nor implied.* It is the responsibility of every authorized user to be aware of, and comply with, all corporate policy and guidelines while using messaging systems. All data and content on these messaging systems is the property of the Company. *No content on these messaging systems shall be withheld from the Company's authorized security personnel or others specifically authorized by the chief executive officer of the Company.* (Emphasis added.)

Read together, the two corporate statements clearly set forth a policy banning personal use of the e-mail messaging system, and authorizing access and monitoring. Furthermore, the policies warn that the messages belong to the corporation, and privacy "is not guaranteed, nor implied."

None of the policies mentions Asia Global by name. The Trustee nevertheless attributes them to the debtor based on a memorandum, dated February 28, 2002, from Carroll to Lod Cook. (*See Declaration of Robert A. Wolf in Further Support of Trustee's Motion Pursuant to Bankruptcy Rule 2004 to Compel Production of Documents*, dated November 2, 2004 (the "*Wolf Reply Declaration*"), at Ex. A)(ECF Doc. # 493.) The subject of the memorandum is "Asia Global Crossing E-Mail Security." It was apparently written in response to a prior report by John LoBianco which stated that John Legere, the onetime chief executive officer of both Global Crossing and Asia Global Crossing, had accessed and read e-mails in the mailboxes of several high level Asia Global officers, including several of the Insiders.

The thrust of Carroll's memorandum was that Asia Global did not have a policy that allowed the chief executive officer full access to employee e-mail to monitor the business. In support of his conclusion, Carroll stated that he had reviewed all published Asia Global Crossing and Global Crossing policies, found no support for any such policy, and attached copies of the policy statements he reviewed. The attachments included the Corporate E-mail Policy, the Messaging Policy, the Ethics Policy and the Global Crossing Acceptable Use Policy.

The memorandum and Carroll's later declaration are inconsistent on this crucial point. The memorandum plainly implied that Asia Global (as well as Global Crossing) had a "published" policy relating to e-mail use. Furthermore, Carroll stated that he had reviewed and attached the policies to his memorandum. The only policies that he attached were those already mentioned, but the memorandum did not identify which policies belonged to Asia Global and which ones were limited to Global Crossing. He never suggested that he had failed to uncover an Asia Global e-mail policy, or that none existed. In his recent Declaration, however, Carroll stated that the attached policies were Global Crossing's, not Asia Global's, and as noted, Asia Global did not have a formal policy in place. (*Carroll Declaration*, at ¶ 3.)

The Insiders also insist that they did not know of or tell anyone about an Asia Glob-

al e-mail policy. Yet their failure to warn the employees of an existing e-mail policy does not necessarily mean that the employees, including the Insiders, were not on notice of the e-mail policy. For example, at log on, some business computers, including those used by this Court's personnel, warn users about personal use and the employers' right to monitor. In some cases, the user actually consents to the limits, or is advised that by continuing to use the system, he will be deemed to have consented to the restrictions. In short, the Court is unable to conclude as a matter of law that the Insiders' use of Asia Global's e-mail system to communicate with their personal attorney eliminated any otherwise existing attorney-client privilege.

### 6. The Hard Copy Documents

■ Assuming that the Hard Copy Documents are otherwise privileged, the Trustee's waiver argument rests on two prongs: (1) the Hard Copy Documents were abandoned at the Asia Global offices, and (2) some of the Hard Copy Documents may have been generated or stored on Asia Global computers. Since the second point is speculation, and furthermore, does not automatically lead to a waiver for the reasons discussed, the Court will limit the discussion to the first point.

John Scanlon's declaration attested to the hurried departure by the Insiders. The Trustee essentially told him, while he was out of town, to lock Asia Global's doors and get out. He never returned to the debtor's California offices, and the existing record does not support a finding that he intentionally abandoned the Hard Copy Documents or relinquished any privilege in their contents. While the other

Insiders may have still been working in the California office or had access to it, they too were told to quit the premises, and apparently left in a hurry. In any event, the Insiders stated in their Declarations that any e-mails or documents left behind was due to inadvertence. For present purposes, I do not conclude, as a matter of law, that the Insiders waived an existing privilege in the Hard Copy Documents.

### 7. The Troxell Documents

■ The Troxell Documents, which were examined *in camera*, consist of eight e-mail chains or conversations,[10] taking place on May 21 and May 22, 2003, between the Insiders, their counsel and Troxell.[11] Each chain contains the same two principal e-mail messages. First, Riesenfeld sent an e-mail to his lawyers, Jeanne Irving, Esq., and A. Brent Truitt, Esq., regarding "imputed interest" income on certain company loans. Copies were sent to Insiders Carroll and Scanlon, and to Richard Casher, Esq., a partner in Kasowitz, Benson, Torres & Friedman, LLP, the law firm that represented Asia Global in the chapter 11 proceedings.

The second main e-mail was Truitt's response to Riesenfeld. It referred to "imputed interest" information in Asia Global's schedules. Copies were again sent to Carroll, Scanlon and Casher.

The balance of the several chains involved communications either with or about contacting Troxell for a clarification of the information regarding the "imputed interest." They do not reflect any substantive response or information.

The e-mail chains are not privileged, or alternatively, any privilege was waived, be-

---

**10.** The eight chains are Bates stamped as "Troxell" and numbered as follows: (1) 58–60, (2) 61–62, (3) 63–64, (4) 65–67, (5) 68–69, (6) 70–71, (7) 72–73 and (8) 74–75.

**11.** No privilege log listing the Troxell Documents was delivered. The Court received copies and reviewed the documents *in camera*.

cause they were sent to Casher and Troxell. *See In re Horowitz*, 482 F.2d at 81 ("subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege"). Riesenfeld and Truitt voluntarily sent copies of the principal e-mail messages to Casher. Furthermore, Carroll forwarded each entire e-mail chain to Troxell, an Asia Global consultant.[12]

## C. The Work Product Privilege

### 1. Background

■■■■ The work-product rule is a qualified privilege codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure.[13] *Upjohn Co. v. United States*, 449 U.S. 383, 398, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471 (S.D.N.Y.1993). First recognized by the Supreme Court in the landmark decision of *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). The doctrine strikes a balance between the right to know and the lawyer's ability to prepare his case:

> Inherent in recognition of a privilege for attorney work product is a judgment that society's interest in ferreting out the truth through litigation will not best be served by exposing a party's case to impeachment by documents reflecting the opinions or preliminary evaluations of its counsel, even if the party's position in court is inconsistent with counsel's private thoughts.

*In re Sealed Case*, 676 F.2d 793, 817 n. 95 (D.C.Cir.1982). The party asserting the privilege has the burden of proving its basis. *In re Leslie Fay Cos. Sec. Litig.*, 161 F.R.D. 274, 280 (S.D.N.Y.1995); *Park Avenue Bank, N.A. v. Bankasi*, 93 Civ. 1483, 1994 WL 722690 at *1 (S.D.N.Y. Dec.30, 1994); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. at 470.

### 2. Waiver

■■■■ The work product doctrine protects the attorney's materials, and consequently, the attorney may waive the benefit of the privilege. *Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y.1990). Although the client can also waive the privilege as to non-opinion work product, the attorney may still contest the waiver as to opinion work product. *See Buck v. Aetna*

---

12. The Insiders described Troxell as a business associate, and said they needed her assistance to provide information for their legal representation. (*Irving Declaration*, at ¶ 31.) But Troxell worked for Asia Global, and the Insiders sought information from her that was contained in Asia Global's books and records.

13. Rule 26(b)(3) provides, in pertinent part, as follows:

    [A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*Life & Casualty Co.*, Civ. A. No. 91–2832, 1992 WL 130024 at *2 (E.D.Pa. June 5, 1992).

■■■ The work product privilege, unlike the attorney-client privilege, does not depend upon an expectation or intent that the communication will remain confidential. *See* 8 CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2024 (2d ed. 1994)("WRIGHT & MILLER"). A waiver will occur when the information is voluntarily disclosed to an adversary. *United States v. Nobles*, 422 U.S. at 239, 95 S.Ct. 2160; *Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir.1993); *In re John Doe Corp.*, 675 F.2d 482, 489 (2d Cir.1982). Conversely, no waiver attends a disclosure that has not "substantially increased the opportunities for potential adversaries to obtain information." *United States v. Stewart*, 287 F.Supp.2d 461, 468 (S.D.N.Y.2003)(quoting 8 WRIGHT & MILLER § 2024)(internal quotation marks omitted); *accord In re Pfizer Inc. Sec. Litig.*, No. 90 Civ. 1260, 1993 WL 561125, at *6 (S.D.N.Y. Dec.23, 1993).

### 3. The Insider E-mails and Hard Copy Documents

■■■ Assuming that the Insider E-mails are otherwise privileged under the work product doctrine, the Trustee maintains, as he did earlier, that the transmission of the Insider E-mails over Asia Global's e-mail system waived the privilege. (*Trustee's Memorandum*, at 4.) In addition, he contends that the Insiders waived the privilege in the Hard Copy Documents by leaving them behind at Asia Global's premises. The Insiders replied in their declarations that any disclosure was inadvertent. In deciding whether the disclosure is inadvertent, courts consider "(1) the reasonableness of the precautions taken by the producing party to prevent inad-

vertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure at issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the overarching issue of fairness." *United States v. Rigas*, 281 F.Supp.2d 733, 738 (S.D.N.Y.2003).

■■■ The question of "inadvertence" cannot be resolved on the state of the existing record. No distinction has been made between opinion and non-opinion work product. If the documents included opinion work product, the Insiders could not have waived it. Furthermore, the record does not disclose what precautions were taken to protect the information. The Insiders may have reasonably believed that the e-mails would remain confidential, and no additional precautions were necessary. On the other hand, their declarations say that they had private offices, but do not mention whether they locked their offices, whether anyone had access to their computers or files, or for that matter, whether they even kept the Hard Copy Documents in their offices.

### 4. The Troxell Documents

■■■ On the other hand, any work product privilege in the Troxell documents was waived. Counsel sent the two substantive e-mails to Richard Casher, Esq., and hence, voluntarily disclosed them to the Insiders' adversary. In addition, each entire e-mail chain was sent to Troxell. Since the communications involved a potential dispute between the Insiders and the estate, the disclosure of the communications to the debtor's attorney and consultant obviously put the communication in the hands of the Insiders' adversary.

### D. Common Interest Privilege

Finally, the Insiders assert that "[c]ertain of these communications are among

law firms other than [the Insiders'] counsel, representing clients whom [Insiders' counsel] does not represent, in matters to which neither [the Trustee] nor [the debtor] are parties." (*Memorandum of [Insiders] in Opposition to Trustee's Motion Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Compel Production of Documents*, dated Nov. 1, 2004, at 20)(ECF Doc. # 485.) Thus, they invoke the "common interest" privilege.

■■■ The common interest privilege is an extension of the attorney-client privilege. *Schwimmer*, 892 F.2d at 243. It "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.* The doctrine is limited to situations where multiple parties are represented by separate counsel but share a common interest about a legal matter.[14] *Schwimmer*, 892 F.2d at 243; *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y.1995). It is not necessary that there be actual litigation in progress for the common interest doctrine to apply. *Schwimmer*, 892 F.2d at 244.

■■■ "Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected" by the common interest doctrine. *United States v. Weissman*, 195 F.3d 96, 99 (2d Cir.1999)(quoting *Schwimmer*, 892 F.2d at 243)(internal quotation marks omitted). Under the Second Circuit's approach, "some form of joint strategy is necessary to establish the existence of a joint defense agreement, which would then operate to protect evidence under the common interest rule." 3 WEINSTEIN, ¶ 503.21[3] at 503–72 (citing *Weissman*, 195 F.3d at 99–100). Mere cooperation among the parties, absent the intent to participate in a joint strategy, does not create the requisite ongoing common enterprise. *See United States v. Weissman*, 195 F.3d, at 99–100.

■■■ "As in all claims of privilege arising out of the attorney-client relationship," the proponent must establish that the communication was given in confidence, and under circumstances that made it objectively reasonable for the client to believe that the communication was confidential. *Schwimmer*, 892 F.2d at 244. Once established, the privilege cannot be waived without the consent of all of the parties that share it. *John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 556 (8th Cir. 1990); *In re Grand Jury Subpoenas, 89–3 and 89–4, John Doe 89–129*, 902 F.2d 244, 248 (4th Cir.1990); *Bass Public Ltd. Co. v. Promus Cos.*, 868 F.Supp. 615, 621 (S.D.N.Y.1994).

■■■ Here, the parties have given short shrift to the common interest privilege. The Insiders did not identify the other parties who share the privilege, or any facts supporting the privilege. Rather, their memorandum merely refers to the common interest privilege virtually in passing. (*See Insiders' Memorandum*, at 20.) The Trustee did not even respond to the assertion of the privilege. But assuming that the common interest privilege applies, the Trustee has failed to show as a matter of law that it was waived.

---

14. In contrast, the "joint defense" or "joint client" privilege applies when two or more clients are represented by the same attorney on matters of common interest. *See* 3 WEINSTEIN, ¶ 503.21[1], at 503–67 to 503–68. Nevertheless, courts sometimes use "joint defense" and "common interest" interchangeably. *See Schwimmer*, 892 F.2d at 243.

## CONCLUSION

With the exception of the Troxell Documents, the evidence of record does not permit the conclusion that a waiver of any privilege has occurred. The parties are directed to contact chambers to schedule a conference to address further proceedings.

So ordered.