**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

ANDRE G. BOUCHARD
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted:  November 18, 2020
Date Decided:  December 22, 2020

William M. Lafferty, Esquire
Kevin M. Coen, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19801

Elena C. Norman, Esquire
Rolin P. Bissell, Esquire
Nicholas J. Rohrer, Esquire
Young Conaway Stargatt & Taylor LLP
Rodney Square
1000 N. King Street
Wilmington, DE 19801

William B. Chandler III, Esquire
Brad D. Sorrels, Esquire
Wilson Sonsini Goodrich & Rosati, P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE 19801

Michael A. Barlow, Esquire
E. Wade Houston, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Robert S. Saunders, Esquire
Sarah R. Martin, Esquire
Skadden Arps Meagher & Flom LLP
920 N. King Street
Wilmington, DE 19801

RE:  *In re WeWork Litigation,* Consol. Civil Action No. 2020-0258-AGB

Dear Counsel:

This letter constitutes the court's decision on the motion of plaintiffs Adam Neumann and We Holdings LLC (together, "Neumann") to compel defendant SoftBank Group Corp. ("SBG") to produce 89 documents SBG has withheld on attorney-client privilege grounds (the "Documents").  The Documents consist of emails sent to or from email accounts of Sprint, Inc.—a third-party that played no

role in the subject matter of this action—that were used for non-Sprint purposes. Plaintiff The We Company ("WeWork" or the "Company") joins in the motion, which is granted for the reasons explained below.

## I.     Background

The background of this action is described extensively in several previous decisions.[1]  In brief, the issue in this case is whether SBG and/or SoftBank Vision Fund (AIV MI) L.P. ("Vision Fund") breached their respective obligations under a Master Transaction Agreement they entered into on October 22, 2019 (the "MTA") to use reasonable best efforts to consummate a tender offer whereby SBG would purchase up to $3 billion of the Company's stock from Neumann and other stockholders for at least $19.19 per share (the "Tender Offer").  The Tender Offer commenced on November 22, 2019, became oversubscribed, and was terminated by SBG on April 1, 2020 without accepting any shares for payment.

From mid-2019 until April 1, 2020, when Sprint and T-Mobile US, Inc. merged, SBG owned approximately 84% of Sprint.[2]  During this same period,

---

[1] *See In re WeWork Litig.*, 2020 WL 7346681 (Del. Ch. Dec. 14, 2020); *In re WeWork Litig.*, 2020 WL 7343021 (Del. Ch. Dec. 14, 2020); *In re WeWork Litig.*, 2020 WL 6375438 (Del. Ch. Oct. 30, 2020); *In re WeWork Litig.*, 2020 WL 4917593 (Del. Ch. Aug. 21, 2020).

[2] SBG Opp'n ¶ 4 (Dkt. 436); *see also* May Decl. ¶ 2 (Dkt. 437); Hendershot Decl. Ex. N (SoftBank Group Corp. Press Release Announcing Completion of Merger of Sprint and T-Mobile, dated Apr. 2, 2020), at 1 (Dkt. 455).

several of SBG's document discovery custodians in this action wore multiple hats. Marcelo Claure served as SBG's Chief Operating Officer and as Chairman of WeWork and Sprint. Michael Combes was Sprint's CEO and simultaneously assisted Claure on WeWork-related matters. Two other custodians, Sprint employees Christina Sternberg and Forrest Wilson, were seconded to SBG to work as Claure's Chief of Staff and Staff Operations Director, respectively. According to SBG, "[w]hile acting on SBG's behalf, Combes and Sternberg sought and received legal advice from SBG's internal and external counsel regarding WeWork."[3]

The Documents were sent to or from Sprint email accounts used by Combes (64 documents) and Sternberg (25 documents).[4] All of the Documents were responsive to Neumann's discovery requests in this action but were withheld from production or produced in a redacted form by SBG on the ground of attorney-client privilege.[5] It is undisputed that none of the Documents concern the business or affairs of Sprint or any legal advice rendered for Sprint's benefit.

---

[3] SBG Opp'n ¶ 8.

[4] Neumann Mot. to Compel ¶ 4 (Dkt. 414). Neumann originally sought one additional document from the Sprint email account of Forrest Wilson. That issue has been resolved. *See* Neumann Reply 3 n.1 (Dkt. 454).

[5] Some of the Documents also were sent to or from employees of Vision Fund. Neumann Mot. to Compel 6 n.2.

During the period in question, Combes and Sternberg both had access to email accounts other than their Sprint email accounts that they could use for SBG-related matters. Specifically, Combes had use of a WeWork-related Gmail account, which identified him as "Michel WeWork," and Sternberg had use of a "softbank.com" email account.[6]

## II. Analysis

Neumann's motion turns on one issue: Did Combes and Sternberg have a reasonable expectation of privacy when using their ***Sprint*** email accounts for ***SBG-related*** purposes such that the Documents would constitute "confidential communications" under Delaware Rule of Evidence 502? Under Rule 502(a)(2), "[a] communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."[7]

"The burden of proving that the [attorney-client] privilege applies to a particular communication is on the party asserting the privilege."[8] "A party's

---

[6] *See* Hendershot Decl. Ex. B (Email from Vikas Parekh to Christina Sternberg cc: Chris McKinnon, Michel Combes, and MC Office Re: WeWork China – Favor, dated November 11, 2019) (Dkt. 415); SBG Opp'n 4 n.2.

[7] D.R.E. 502(a)(2).

[8] *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992).

subjective expectation of confidentiality must be objectively reasonable under the circumstances."[9]

Both parties rely heavily on Vice Chancellor Laster's decision in *In re Information Management Services, Inc. Derivative Litigation,*[10] which thoroughly analyzes the legal issues associated with using work email accounts for non-work related purposes. There, the court noted as a preliminary matter that "whether the employee has a reasonable expectation of privacy must be decided on a case-by-case basis."[11] The court then found, applying the four factor test articulated in *In re Asia Global Crossing, Ltd.,*[12] that two senior officers at Information Management Services, Inc. (IMS) did not have a reasonable expectation of privacy in their work email accounts.[13] The four *Asia Global* factors are:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?[14]

---

[9] *In re Info. Mgmt. Servs., Inc. Deriv. Litig.*, 81 A.3d 278, 285 (Del. Ch. 2013) (citing *Upjohn v. United States*, 449 U.S. 383, 389, 395 (1981)).

[10] 81 A.3d 278 (Del. Ch. 2013).

[11] *Id.* at 287 (internal quotation marks and citation omitted).

[12] 322 B.R. 247 (Bankr. S.D.N.Y. 2005).

[13] *Info. Mgmt. Servs.*, 81 A.3d at 287.

[14] *Asia Global*, 322 B.R. at 257 (internal citation omitted).

As discussed below, each of these four factors weigh in favor of production of the Documents.

The first factor "has been held to weigh in favor of production when the employer has a clear policy banning or restricting personal use, where the employer informs employees that they have no right of personal privacy in work email communications, or where the employer advises employees that the employer monitors or reserves the right to monitor work email communications."[15] The Sprint Code of Conduct contains two of these admonitions:

> Employees should have *no expectation of privacy* in information they send, receive, access or store on any of Sprint's computer systems or network. . . . Sprint reserves the right to review workplace communications (including but not limited to Internet activity, *email*, instant messages, social media or other electronic messages, computer storage and voicemail) as well as employees' company-provided workspaces at any time.[16]

SBG argues that the Sprint Code of Conduct "acknowledges that Sprint will protect the privacy of its employees' e-mail account."[17] This assertion is based on a sentence from the Code of Conduct that SBG quotes misleadingly by omitting the language italicized below:

---

[15] *Info. Mgmt. Servs.*, 81 A.3d at 287 (collecting authorities).

[16] May Decl. Ex. F (Sprint Corporation, Code of Conduct, effective May 25, 2018), at 12 (emphasis added).

[17] SBG Opp'n ¶ 25.

6

> Sprint is committed to protecting employees' privacy **in regards to medical, family and personal information** by refraining from discussing private matters when there is not a valid business "need to know," as well as protecting sensitive information in compliance with domestic and international data protection and privacy laws.[18]

When this sentence is read in full, it is of no aid to SBG because the Documents do not concern medical, family, or personal information.

SBG also argues that "Sprint did not have a 'clear policy banning' personal use of email."[19] The lack of such a statement in Sprint's Code of Conduct is a factor to consider but it is not dispositive.[20] Here, the lack of an express ban on personal use of email is outweighed by the two admonitions contained in Sprint's Code of Conduct quoted above, in particular the explicit warning that employees should have no expectation of privacy when using their Sprint email accounts.[21] The first *Asia Global* factor supports production of the Documents.

The second factor asks whether the company monitors the use of the employee's computer or e-mail. SBG asserts "[t]here is no indication that Sprint has ever reviewed any communications from within Combes' or Sternberg's

---

[18] May Decl. Ex. F, at 12 (emphasis added).

[19] SBG Opp'n ¶ 25 (quoting *Info. Mgmt. Servs.*, 81 A.3d at 287).

[20] *See Info. Mgmt. Servs.*, 81 A.3d at 289 (finding the first *Asia Global* factor weighed in favor of production where IMS's policy did not ban personal use of company email, but the policy sufficiently "put IMS employees on notice that their work emails were not private").

[21] May Decl. Ex. F, at 12.

accounts."[22] Neither party has provided evidence regarding Sprint's monitoring practices. This lack of evidence does not work in SBG's favor because it bears the burden of proving that the privilege applies.[23]

What is more, where, as here, an "employer has clearly and explicitly reserved the right to monitor work email, then the absence of past monitoring or a practice of intermittent or as-needed monitoring comports with the policy and does not undermine it."[24] As the court found in *Information Management Services*, "[t]he fact that IMS has not historically monitored emails does not conflict with its implicit reservation of the right to do so."[25] Given Sprint's express reservation of its right to review employee email communications and SBG's failure to provide evidence of conduct inconsistent with this reservation, the second *Asia Global* factors weighs in favor of production of the Documents.[26]

---

[22] SBG Opp'n ¶ 24.

[23] *Moyer*, 602 A.2d at 72; *see also In re Royce Homes, LP*, 449 B.R. 709, 733 n.14 (Bankr. S.D. Tex. Mar. 11, 2011) ("If Speer's counsel wanted to establish that Speer was unaware of the Debtor's Electronic Communications Policy, and that this policy was not enforced, he needed to introduce competent evidence. He did not do so. Accordingly, there is nothing in the record to support the allegation that Speer was unaware of the policy and that this policy was not enforced.").

[24] *Info. Mgmt. Servs.*, 81 A.3d at 289 (collecting authorities).

[25] *Id.* at 290.

[26] SBG argues there was a reasonable expectation of privacy for Combes and Sternberg's Sprint emails because "Sprint's IT department was not going to pry into SBG's privileged communications with Sprint's CEO and Claure's Chief of Staff." SBG Opp'n ¶ 26. Putting aside SBG's failure to submit any evidence to support this assertion, this

The third factor asks whether third parties have the right to access the computer or e-mails at issue. In a dispute like this concerning use of work email, the third factor "largely duplicates the first and second factors, because by definition the employer has the technical ability to access the employee's work email account."[27] SBG has not provided any compelling evidence that Combes or Sternberg took "significant and meaningful steps to defeat access" by Sprint, "such as shifting to a webmail account or encrypting their communications."[28] The third *Asia Global* factor thus weighs in favor of production of the Documents.

The fourth factor, whether the employees were aware of the use and monitoring policies, also supports Neumann's motion. "If the employee had actual or constructive knowledge of the policy, then this factor favors production because any subjective expectation of privacy that the employee may have had is likely

---

court has rejected the contention that high level employees have a unique expectation of privacy in their corporate email accounts due to the nature of their positions. *Info. Mgmt. Servs.*, 81 A.3d at 290 (holding that senior officers' "expectations of privacy in their work email are no different from any other employee's" because "[t]he board of directors, not senior management, has the final say on accessing any employee's email").

[27] *Info. Mgmt. Servs.*, 81 A.3d at 290 (collecting authorities).

[28] *Id.* at 291. SBG does not contend that Combes and Sternberg's use of their Sprint email account was inadvertent and, as discussed below, the volume of putatively privileged emails at issue here would undermine such an assertion.

unreasonable. Decisions have readily imputed knowledge of an employer's policy to officers and senior employees."[29]

SBG has not submitted any evidence that Combes or Sternberg were unaware of the policies in Sprint's Code of Conduct, and it is hard to imagine they would have been unaware. During the relevant period, Combes was Sprint's CEO and Sternberg was Chief of Staff to Claure who, among his many roles, was Sprint's Executive Chairman. Notably, Sprint's Code of Conduct begins with a message from Claure[30] and, in a section entitled "Tone at the Top," states that "Sprint leaders have a responsibility to understand and uphold the Code as you play a key role in setting the right ethical tone for your organization."[31] Knowledge of Sprint's policies concerning use of its email accounts thus can fairly be imputed to Combes and Sternberg.[32]

Sternberg, furthermore, told Claure on April 8, 2020: "I need your ok to put Michel [Combes] under a consulting agreement with SoftBank. We need this for

---

[29] *Id.* at 291-92.

[30] May Decl. Ex. F, at 2.

[31] *Id.* at 8.

[32] *See Info. Mgmt. Servs.*, 81 A.3d at 292.

SoftBank's protection."[33] Although this statement does not refer specifically to Sprint's email policies, it supports a reasonable inference Sternberg understood that the confidentiality of SBG information was at risk if it was not walled off from Sprint. This subjective understanding would negate any reasonable expectation of privacy by Sternberg when using her Sprint email account for SBG-related purposes.

The record suggests SBG also was aware of the risks to maintaining privilege when commingling the resources of separate corporate entities, including email accounts. On November 4, 2019, Robert Townsend, SBG's Chief Legal Officer, wrote to various SoftBank employees "[w]e also need to think through how we maximize protection of priviledge [sic] which I assume will require a separate Common Interest and Confidentiality Agreement between the corporate entities."[34] Wilson, Claure's Staff Operations Director, highlighted the same concern with respect to WeWork "email monitoring," writing in an email to Claure the same day that "[w]e flag any hot items and forward as needed but are attempting to mitigate any potential legal privilege issues which could arise from

---

[33] *See* Hendershot Decl. Ex. F (Chat between Marcelo Claure and Christina Sternberg, dated April 8, 2020, with talking points to be provided to WeWork's CEO (Sandeep Mathrani) concerning the filing of this action), at SBG_DEL_000278352.

pending litigations by limiting what content we forward to SoftBank email accounts."[35]

In sum, as to the fourth *Asia Global* factor, it is readily inferable from the record that Combes and Sternberg were aware of Sprint's email policies and thus could not have had a reasonable expectation of privacy when they used their Sprint email accounts to share SBG's information, the subject matter of which concerned WeWork and had nothing to do with Sprint. More broadly, for all the reasons discussed above, each of the four *Asia Global* factors weigh in favor of production of the Documents.

Arguing outside of the *Asia Global* framework, SBG advances two additional reasons why the motion should be denied. First, SBG contends that Sternberg and Combes "[b]oth owed duties of confidentiality to SBG" stemming from agreements they each signed with SBG.[36] Second, SBG argues that this case

---

[34] Hendershot Decl. Ex. H (Email from Gauri Manglik to Chad Fentress, Rob Townsend, and Julie Lim cc: Patricia Menendez Cambo and Brendan Kelleher Re: Secondment Agreements for MC's Team, dated November 4, 2019), at SBG_DEL_000189373-74.

[35] Hendershot Decl. Ex. E (Email from Forrest Wilson to Marcelo Claure cc: M.C. Support Re: Questions November 3 ET, dated November 4, 2019), at SBG_DEL_000061671.

[36] SBG Opp'n ¶ 23; *see* Hendershot Decl. Ex. I (Consulting Agreement by and between SB Group US, Inc., Sprint Corporation, and Michel Combes, dated March 30, 2020), § 2; May Decl. Ex. C (Non-Disclosure Agreement, entered into as of February 28, 2019, between SB Group US, Inc. and Christina Sternberg), § 2; May Decl. Ex. E (Employee Proprietary Information and Inventions Agreement, dated November 26, 2019), § 1.

is distinguishable from *Information Management Services* because Neumann is an "outsider" who "had no access to the Sprint system."[37]  Neither of these additional arguments carry the day in my view for the following reasons.

As to the first point, the fact that Combes and Sternberg are parties to agreements obligating them to keep SBG's information confidential does not mean that they had a reasonable expectation of privacy in using their Sprint email accounts for non-Sprint matters.  To that end, SBG points to no language in any agreement where Sprint, which is in possession of the Documents, authorized Combes or Sternberg to use Sprint's email accounts for non-Sprint or SBG-related purposes.[38]

The second point touches on the court's observation in *Information Management Services* that "the premise that an employer's access to an employee's work email compromises the attorney-client privilege makes the most

---

[37] SBG Opp'n ¶ 18.

[38] The only agreement in the record as to which Sternberg, SBG, and Sprint are all parties says nothing about confidential information and places no affirmative duties on Sprint. *See* May Decl. Ex. B (Agreement for Labor and Expense Reimbursement, effective as of May 31, 2018, between SB Group US, Inc. and Sprint/United Management Company). As to Combes, it is not clear when his confidentiality obligations to SBG went into effect. Combes' Consulting Agreement, to which SBG and Sprint are both parties, is dated March 30, 2020 and states that Combes began to serve as a consultant to SBG "on or about October 1, 2019." *See* Hendershot Decl. Ex. I, at 1.  SBG has offered no evidence, however, as to what point in time before executing this contract, if ever, SBG and Sprint entered into an oral confidentiality agreement with Combes.

sense in litigation between the employer or its successor-in-interest and the employee" and may not "translate[] so easily when the party trying to overcome the privilege is not the corporation or its successor-in-interest."[39]   As Vice Chancellor Laster recognized, however, "courts have applied the *Asia Global* factors and found no reasonable expectation of privacy in suits by outsiders."[40]

SBG identifies no contrary authority on this point.[41]

---

[39] *Info. Mgmt. Servs.*, 81 A.3d at 296.

[40] *Id.* at 296 (citing *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 2011 WL 1193030 (E.D. La. Mar. 28, 2011) (denying claim of marital privilege based on employer's email policy in a lawsuit brought by property owners injured by oil spill)).  *See also Bingham v. Baycare Health Sys.*, 2016 WL 3917513, at *5-6 (M.D. Fla. July 20, 2016) (ruling that emails forwarded to a plaintiff's work email were not privileged as to a third party defendant because the plaintiff's employer maintained a policy that weighed in favor of production under *Asia Global*); *Chechele v. Ward*, 2012 WL 4481439, at *2 (W.D. Okla. Sept. 28, 2012) (finding that a defendant employee "had no objectively reasonable expectation of privacy or confidentiality regarding his attorney-client communications and effectively waived the attorney-client privilege for those communications" because his employer (SandRidge), which was a nominal defendant in a lawsuit brought by a third party plaintiff who had no connection to it, had a policy that "clearly notifies SandRidge's employees that their e-mails are not guaranteed to be private or confidential, that their e-mails are considered SandRidge property, that SandRidge reserves the right to examine, monitor, and regulate e-mail messages, and that e-mail messages are considered business records and may be subject to discovery in the event of litigation"); *In re Rsrv. Fund Sec. & Deriv. Litig.*, 275 F.R.D. 154, 156 (S.D.N.Y. 2011) (ordering production of an employee's personal emails to the Securities and Exchange Commission because the employee has no reasonable expectation of privacy due to the employer's email policy).

[41] The authorities on which SBG relies all appear to involve a scenario not present here, *i.e.*, communications shared between a parent corporation and its *wholly-owned* subsidiary.  *See Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2009 WL 8726822 (Del. Ch. Sept. 30, 2009) (Strine, V.C.) (TRANSCRIPT) (denying motion to compel where "a solvent subsidiary -- whose equity at that time was wholly owned by a parent" shared information with the parent because "the mere fact that the

It also is significant that SBG does not, and could not credibly, argue that Combes and Sternberg's use of their Sprint email accounts to send or receive the Documents was inadvertent. As discussed above, multiple SBG employees—including its Chief Legal Officer (Townsend), Claure's Chief of Staff (Sternberg), and his Staff Operations Director (Wilson)—raised concerns about protecting SBG's information and, more specifically, its legal privileges. To that end, Combes and Sternberg both had alternative emails accounts at their disposal for conducting SBG business. Despite these arrangements, they both failed to ensure the confidentiality of SBG's privileged information on numerous occasions—64 times for Combes and 25 times for Sternberg. Given these circumstances and the lack of any legal authority supporting SBG's position, the court declines to deviate from the *Asia Global* framework simply because the party seeking to overcome the privilege is not the corporation whose email system was used for non-work related purposes.

---

communications involved both a parent and sub is not, in my view, a basis for finding a waiver of privilege"); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 370 (3d Cir. 2007), *as amended* (Oct. 12, 2007) ("Within the *wholly owned* corporate family, it superficially makes sense to hold, as BCE urges, that the family is really one client for purposes of the privilege and that the privilege is held exclusively by the parent because all fiduciary duties flow to the parent." (emphasis added)); *Mennen v. Wilmington Tr. Co.*, 2013 WL 5288900, at *11 (Del. Ch. Sept. 18, 2013) (Master's Report) (stating generally that "[parent]'s participation in the communications does not destroy the privilege," before deciding that parent's participation did not "serve as a basis to conclude that [parent] was a 'joint client' with [subsidiary]").

15

* * * * *

For the reasons explained above, Neumann's motion to compel production

of the Document is **GRANTED**.


Sincerely,

*/s/ Andre G. Bouchard*

Chancellor

AGB/gm