**In re Charalabos BAKALIS a/k/a Bob Bakalis, Debtor.**

**Bankruptcy No. 194–12310–353.**

United States Bankruptcy Court,
E.D. New York.

Aug. 20, 1996.

Phillips Nizer Benjamin Krim & Ballon, LLP by Stuart A. Summit and Lori Posner, New York City, for Trustee Gregory Messer.

Cullen and Dykman by Cynthia Boyer Okrent, Brooklyn, New York, for Olympian Bank.

### DECISION ON MOTION TO COMPEL AND OTHER REQUESTS

JEROME FELLER, Bankruptcy Judge.

### INTRODUCTION

This discovery dispute arises in the context of the chapter 7 case of Charalabos Bakalis ("Debtor"). The disputants are Gregory Messer, the chapter 7 trustee ("Trustee"), and Olympian State Bank ("Olympian"), a New York state banking corporation with branches in Bay Ridge, Brooklyn and Astoria, Queens. The most significant asset of the Debtor's estate is about eighty percent (80%) of Olympian's outstanding shares, which the Trustee is trying to sell. Olympian, pursuant to recent authorization of its board of directors, entered into certain contractual obligations with its directors, officers and employees, which the Trustee perceives as impeding his sale of the shares and decreasing their value. An order was entered authorizing the issuance of subpoenas directing Olympian, pursuant to Fed.R.Bankr.P. 2004, to produce to the Trustee for inspection documentation pertaining to these obligations and for oral examination of certain Olympian directors, officers and attorneys. Subpoenas were issued and served, with which Olympian has largely complied. However, some documentation was produced in redacted form or withheld entirely and, at oral examination, certain witnesses refused to answer certain questions. This resistance to discovery was predicated, in the main, on invocation of the attorney-client privilege. The Trustee now moves to compel the production of withheld documents and the completed testimony of witnesses ("Motion"), which Olympian opposes. In addition, as so often happens in dis-

putes of this type, what was a legitimate disagreement between parties has degenerated into accusations of obstructionism and unprofessional conduct, culminating in cross-requests for costs and sanctions.

For the reasons set forth below, the Trustee's motion to compel is denied. The cross-requests for costs and sanctions are also denied.

### BACKGROUND

On March 24, 1994, the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"). At the time, the Debtor owned approximately 326,662 shares of Olympian ("Shares"), an 80% controlling interest, and served as chairman of Olympian's board of directors. A post-filing criminal indictment of the Debtor resulted in his resignation from Olympian's board. By order dated August 17, 1995, the Debtor's reorganization case was converted to one under chapter 7, a liquidation provision, and shortly thereafter, Gregory Messer was appointed Trustee. The Trustee, as representative of the Debtor's estate, now owns (80%) of the outstanding shares of Olympian; the members of Olympian's board of directors collectively own the remaining twenty percent (20%).

Pursuant to an order dated November 20, 1995, the Trustee retained the Carl Marks Consulting Group, Co. ("CMCG") to value the Debtor's interest in Olympian in aid of his statutorily mandated sale of the Shares.[1] In the course of making this appraisal, CMCG examined Olympian's books and records and interviewed Richard J. Conti, Olympian's President and Chief Executive Officer. CMCG discovered that on or about December 20, 1995, Olympian's board of directors passed certain corporate resolutions ("Resolutions") authorizing, among other things, Olympian to enter into separate "Change in Control Agreements" with each director and senior officer ("Agreement(s)") and an "Employee Severance Pay Plan" ("Plan"). The Agreements provide for payments to Olympian's directors and senior officers if terminated without good reason or cause within three

years of any "Unapproved Change in Control". The Plan provides for payments to most employees if terminated without good reason or cause, also within three years of any "Unapproved Change in Control". The term "Change in Control" is defined identically in the Agreements and the Plan, and, for the purposes of this controversy, include such events as: 1) a change in ownership of more than 20% of Olympian's outstanding securities; 2) a tender offer for more than 20% of the outstanding voting securities of Olympian; or 3) a change in the make-up of the board of directors so that the membership of the board as presently comprised fails to constitute a majority. *See, e.g., Agreement of George Coffinas,* annexed to the Motion as Ex. B. A change in control is "Unapproved" if not approved by three quarters (¾) of the current board of directors. *Id.* Payments under the Agreements and Plan vary, but could cost Olympian as much as $2.4 million.

The Trustee views the Agreements and Plan as substantially decreasing the value of the Shares and concomitantly, the Debtor's estate. A change in control of Olympian, as defined by the Agreements and Plan, is a virtual certainty upon the inevitable sale of the Shares by the Trustee. Upon such a sale, in order to avoid millions in potential payments, a prospective purchaser would need approval of the present board of directors or must maintain current management and employees. Accordingly, the Trustee moved for an order, pursuant to Fed.R.Bankr.P. 2004, directing Olympian's directors, officers and agents, to submit to oral examination about, and produce documentation relating to, the Resolutions, Agreements and Plan.

The purpose of the order was, in addition to "the purposes specified in Fed.R.Bankr.P. 2004(b)", "to assist in the administration of this estate, and to determine what steps the Trustee should take to maximize the value of the [Shares]." *See Trustee's Motion for Entry of an Order Pursuant to Fed.R.Bankr.P. 2004....,* annexed to the Motion as Ex. A at 6, 7. Specifically targeted for examination

---

1. 11 U.S.C. § 704 provides, in pertinent part, that "The Trustee **shall** (1) collect and reduce to money the property of the estate for which such trustee serves...." (emphasis supplied).

were Mr. Conti as well as Olympian's attorneys, Cullen and Dykman, who the Trustee alleged "may have counseled and assisted in preparing and effectuating the Plan and Agreements." *Id.* The Trustee also set forth a laundry list of requested documentation which, insofar as here germane, included: i) documents concerning consideration and enactment of the Resolutions, Agreements and/or Plan; ii) documents concerning or communications with any attorney or law firm, including Cullen and Dykman regarding the Resolutions, Agreements and/or Plan; and iii) all documents and communications between and among the members of the board of directors of Olympian including, minutes of board meetings, notes or memoranda concerning the Trustee, the Debtor's bankruptcy case and the Trustee's sale of the shares. *See id.* at schedule A. An order authorizing the requested Fed.R.Bankr.P. 2004 examinations and related production of documents was signed by this Court on February 26, 1996 ("Rule 2004 Order") pursuant to which subpoenas were issued and served.

Olympian has largely complied with the subpoenas. Mr. Conti, Olympian directors George Coffinas and Anastasia Athanail, and senior officer Joseph Baldasare all have submitted to oral examination. In addition, Olympian has turned over various documentation, including letters, memoranda and minutes of board of director meetings. Giving rise to the present controversy, however, are questions that were not answered and documentation withheld or produced in redacted form, largely based on the invocation of attorney-client privilege.

The documentation still at issue is set forth by Olympian in a "Privilege List" transmitted to Trustee's counsel under cover of a letter dated March 25, 1996 as follows:

1) Fax cover sheet dated November 20, 1995, from Cullen and Dykman to Mr. Coffinas, transmitting a memorandum dated November 20, 1995, from Cullen and Dykman to Ms. Athanail, Mr. Coffinas and Edmund Nahas, Esq., and draft agreement;

2) Letter dated October 27, 1995, from Thomas Douglas, Esq. of Cullen and Dykman to Mr. Conti, transmitting draft agreement and legal memorandum;

3) Minutes of Olympian's of board of directors meeting held on December 4, 1995 with references to attorney-client communications redacted, as well as references to confidential matters outside the scope of the subpoena.

*See Letter and Privilege List,* annexed to Motion as Ex. H.[2] Also at issue are the minutes of a November 21, 1995 board of director meeting, which were also produced in redacted form, but not referenced in Olympian's "Privilege List."

The withheld deposition testimony is that of Mr. Conti and Cullen and Dykman attorney, Lance Myers, Esq. Mr. Conti, at his examination, testified extensively about the history of the Resolutions, Agreements and Plan, their background and purpose. Conflict arose, however, when the Trustee broached the subject of the Agreement executed by Mr. Conti on his own behalf. Apparently, there exists for Mr. Conti in addition to his Agreement, a previously executed employment agreement. Asked why he executed the Agreement when he was entitled to similar benefits pursuant to the earlier employment agreement, Mr. Conti stated he did so on advice of counsel, but never expected to receive remuneration under both agreements. *See Conti Dep. Tr.,* annexed to the Motion as Ex. G, at 289–90. When asked to elaborate, he refused, invoking attorney-client privilege.

It was at this juncture that the Motion was filed. Citing the "seminal case" of *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), the Trustee argues that, for various reasons, Olympian's management may not invoke the attorney-client privilege to withhold any documentation or testimony

---

**2.** The following documentation referenced in the "Privilege List" is no longer in controversy: Letter dated December 5, 1995, from Mr. Conti to Lance Myers, Esq., Cullen and Dykman attorney, transmitting signed agreements; Letter dated December 21, 1995, from Mr. Conti to Lance Myers, Esq., transmitting signed agreements; Minutes of meetings of board of directors held on November 8, 1995, December 27, 1995, and January 17, 1996.

from the Trustee, Olympian's largest shareholder. In addition, with respect to Mr. Conti's testimony, the Trustee contends that Mr. Conti's statement that he acted on advice of counsel in signing his Agreement constituted a waiver of any attorney-client privilege that may exist. It is this secondary contention which gives rise to the coarse controversy surrounding the testimony of Lance Myers, Esq.

Prior to filing the Motion, but pursuant to the Rule 2004 Order, the Trustee obtained a subpoena directing Mr. Myers to submit to oral examination. The examination was scheduled for a date after the Motion was filed, but before its return date. Apparently, the Motion destroyed any remaining inclination of the parties to resolve their discovery dispute amicably. As far as we can discern, Olympian informed the Trustee that Mr. Myers would assert attorney-client privilege and suggested the examination not go forward, pending judicial resolution of the Motion. The Trustee insisted the examination proceed, if only for the purpose of gauging the extent of Mr. Myers' invocation of privilege. At the examination, Mr. Myers refused to answer all but the most innocuous of the Trustee's questions. Outraged, the Trustee filed a supplemental affidavit and memorandum ("Supplemental Submissions"), ostensibly in support of its Motion, but in reality seeking additional affirmative relief. Specifically, the Trustee, arguing that Mr. Myers' invocation of attorney-client privilege was unconscionably broad, requested that Mr. Myers' testimony too be compelled and that costs and sanctions for Olympian's alleged obstructionist tactics be imposed.

Olympian's vigorous opposition to the substantive aspects of the Motion (no cross-motion to quash any subpoena or for a protective order was ever made) is essentially grounded on a number of propositions. First, Olympian contends the Trustee has failed to demonstrate the relevance of the material sought. Second, even if relevant, Olympian argues that the documents and testimony are protected by attorney-client privilege and that *Garner* may not be applied to pierce the privilege. Finally, Olympian argues *Garner* has not been satisfied. In opposition to the Supplemental Submissions, Olympian responds that its posture at Mr. Myers' examination was warranted in light of the Trustee's improper assertion of waiver by Mr. Conti. Further, Olympian bickers that it was the one who suggested postponement in the first place and, in one final bit of mudslinging, that the costs purportedly incurred by the Trustee as a result are grossly exaggerated. A subsequent flurry of papers filed by both sides added little substance to the present controversy and oral argument was heard on July 9, 1996.

## DISCUSSION

We begin our analysis of this dispute with an overview of Fed.R.Bankr.P. 2004, "the basic discovery device in bankruptcy cases." 8 *Collier on Bankruptcy* ¶ 2004.3[1] at 2004–6 (Lawrence P. King, ed., 15th ed. 1995). Fed.R.Bankr.P. 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Such examination "may relate only to the acts, conduct or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate...." Fed. R.Bankr.P. 2004(b).

The scope of a Bankruptcy Rule 2004 examination is "unfettered and broad." *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr.D.Mass.1983). Its purpose is to facilitate the discovery of assets and the unearthing of frauds and has been likened to a quick "fishing expedition" into general matters and issues regarding the administration of the bankruptcy case. *Id.* (citing *In re Foerst*, 93 F. 190, 191 (S.D.N.Y.1899)). *See also In re Dinubilo*, 177 B.R. 932, 939 (E.D.Ca.1993); *In re French*, 145 B.R. 991, 992 (Bankr. D.S.D.1992); *In re Table Talk*, 51 B.R. 143, 145 (Bankr.D.Mass.1985); *In re Silverman*, 36 B.R. 254, 258 (Bankr.S.D.N.Y.1984). These examinations, typically implemented in the pre-litigation stage of a bankruptcy case, are subject to few of the procedural safeguards normally applicable to discovery under the Federal Rules of Civil Procedure. *See In re Dinubilo*, 177 B.R. at 939–940. Nevertheless, Bankruptcy Rule 2004 examinations are not boundless. They may not be

used for the purposes of abuse or harassment, and cannot stray into matters not relevant to the basic inquiry. *In re Mittco, Inc.,* 44 B.R. 35, 36 (Bankr.E.D.Wis.1984); *see also In re Table Talk,* 51 B.R. at 145. Further, while such examinations may be used to prepare for initiation of litigation, once a matter becomes contested or an adversary proceeding is commenced, further discovery should be obtained pursuant to the Federal Rules of Civil Procedure. *See In re Dinubilo,* 177 B.R. at 941, 943; *In re French,* 145 B.R. at 992. Finally, they are subject to the doctrine of privileges, if applicable, including the attorney client privilege, as governed by Fed.R.Evid. 501. *See 8 Collier on Bankruptcy* ¶ 2004.04 at 2004–12. With these general principles in mind, we proceed to address the merits of the Motion.

The Trustee seeks to compel the production of documentation and testimony withheld by Olympian on the grounds of attorney-client privilege. This Circuit has adopted the following formulation of the elements comprising the attorney-client privilege, originally propounded by Wigmore:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

*See United States v. Kovel,* 296 F.2d 918, 921 (2d Cir.1961) (quoting 8 Wigmore, Evidence § 2292 (McNaughton Rev.1961)). The Trustee does not seem to controvert that the privilege attaches to the communications at issue herein, or that Olympian's management may assert the privilege on Olympian's behalf. *See Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981) ("[T]his Court has assumed that the [attorney-client] privilege applies when the client is a corporation."). Instead, citing *Garner,* the Trustee argues that Olympian should be precluded from asserting the privilege under the present circumstances.

In *Garner,* the Court of Appeals for the Fifth Circuit acknowledged the conceptual difficulties of a corporation asserting the at-torney-client privilege against its shareholders. 430 F.2d at 1101. The Fifth Circuit concluded, however, that the attorney-client privilege does have viability against its shareholders with the following important caveat:

> [w]here the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

430 F.2d at 1103–04. Factors identified in *Garner* to be considered in determining whether "good cause" exists to proscribe the invocation of the privilege include: the number of shareholders and the percentage of stock they represent, the nature of the shareholders' claim against the corporation and whether such claim is obviously colorable; the apparent necessity of the shareholders having the information and its availability from another source. *Id.* at 1104. It is upon these indicia of good cause which the Trustee predicates his Motion.

If the Motion, indeed the entire Chapter 7 phase of this bankruptcy case has any single driving force, it is the Trustee's charges that Olympian has acted inimically towards his interest as an 80% shareholder. Relying on dicta in *Garner,* the Trustee seems to contend that his status as owner of the vast majority of Olympian's shares is alone sufficient to preclude Olympian's assertion of the attorney-client privilege against him under *any* circumstance. 430 F.2d at 1101, ("[I]t is difficult to rationally defend the assertion of the privilege if all, or substantially all, stockholders desire to inquire into the attorney's communications with corporate representatives who have only nominal ownership interests, or none at all."). At the very least, the Trustee argues, his interest in Olympian when considered together with other factors demonstrates "good cause" to preclude Olympian's assertion of the attorney-client privilege under *these* circumstances. The additional factors cited by the Trustee all flow directly from the proposition that the Resolutions, Agreements and Plan have had some

impact on the value of the Shares or their sale—a proposition that cannot be seriously contested. The Trustee acknowledges nursing, as a result, a claim of some nature against Olympian that he contends is more than colorable. *See Affidavit of Stuart A. Summit, Esq. in Support of Motion ("Summit Aff.")* at ¶ 27; *Mem. in Support of Trustee's Motion* at 8. We are told the material sought is necessary to ascertain the true intent of Olympian's directors and senior officers, presumably to facilitate the prosecution of this claim, *see Summit Aff.* at ¶ 2; *Mem. in Support of Trustee's Motion* at 2, and that the only way to discern this intention is through Olympian's communications with its attorneys, Cullen and Dykman, "the key actor in the formulation, drafting, enactment and execution of the Resolutions." *Summit Aff.* at ¶ 36. At first blush, these assertions appear to mesh nicely with the indicia of *Garner.* Closer scrutiny, however, lends credence to crucial aspects of the opposition, although not exactly as formulated by Olympian.

The purpose of the attorney-client privilege is to encourage clients to make full disclosure to their attorneys and it is viewed as essential to the protection of a client's legal rights. *See Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682 (citations omitted); *Quintel Corp. v. Citibank, N.A.,* 567 F.Supp. 1357, 1360 (S.D.N.Y.1983). As stated by the Supreme Court:

> Both for corporations and individuals, the attorney-client privilege serves the function of promoting full and frank communications between attorneys and their clients. It thereby encourages observance of the law and aids in the administration of justice. (citations omitted).

*Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 1990, 85 L.Ed.2d 372 (1985). However, by standing in derogation of the public's "right to every man's evidence", the attorney-client privilege also stands as an obstacle to investigation of the truth. *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973) (citation omitted). Accordingly, the privilege is not absolute. It is to be strictly confined within the narrowest possible limits and applies only where necessary to achieve its purpose. *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Where the policy underlying the privilege is outweighed by the broader public interest, disclosure may be compelled. *See University of Pa. v. Equal Employment Opportunity Comm'n,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990); *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.), *cert. denied, Bilzerian v. U.S.,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *Fausek v. White,* 965 F.2d 126, 129 (6th Cir.), *cert. denied, Selox, Inc. v. Fausek,* 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992).

It is precisely this sort of balancing of competing policies that concerned the court in *Garner.* The Fifth Circuit stated:

> The problem before us concerns ... a balancing of interests between injury resulting from disclosure and the benefit gained in the correct disposal of litigation. We consider it in a particularized context: where the client asserting the privilege is an entity which in the performance of its functions acts wholly or partly in the interests of others [i.e., a corporation], and those others, or some of them [i.e., shareholders], seek access to the subject matter of the communications.

430 F.2d at 1101. While *Garner* has not been addressed in this Circuit, courts of appeals in other circuits have also utilized its reasoning, to various degrees, in resolving the conceptual difficulties which arise when a corporation invokes the attorney-client privilege against its shareholders. *See Cox v. Admin'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1414–16 (11th Cir.1994); *Sandberg v. Virginia Bankshares, Inc.,* 979 F.2d 332, 351–55 (4th Cir.1992); *Fausek,* 965 F.2d at 129–30 (6th Cir.). Several district courts in this Circuit have also utilized *Garner* in resolving this dilemma. *See, e.g., Quintel Corp.,* 567 F.Supp. at 1363; *In re Colocotronis Tanker Sec. Lit.,* 449 F.Supp. 828, 832–834 (S.D.N.Y.1978); *In re Bairnco Corp. Sec. Lit.,* 148 F.R.D. 91, 97–99 (S.D.N.Y.1993). So far as this court is aware, there exists no authority for the Trustee's invocation of *Garner* in support of a bright-line rule preclud-

ing, under any circumstance, the assertion of the attorney-client privilege by a corporation against its shareholder(s) based solely on that shareholder's ownership of a majority of the corporation's shares. By its very nature, a *Garner*—type analysis is fact-sensitive, to be applied on a case by case basis. Based upon the presentation of the Trustee in support of his Motion, however, we fail to even reach the issue of such analysis.

■■■ As is correctly observed by Olympian, before *Garner* may be invoked to compel the disclosure of otherwise privileged communications, the relevance of those communications must first be demonstrated. Absent such a showing, there is no basis for a court to conclude that there exists any potential benefit in compelling disclosure which would outweigh the policy behind maintaining the privilege. *See University of Pa. v. E.E.O.C.,* 493 U.S. at 189, 110 S.Ct. at 582 ("We do not create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence....'") (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980)); *Fisher v. United States,* 425 U.S. at 403, 96 S.Ct. at 1577 ("[T]he privilege has the effect of withholding relevant information from the factfinder...."); *see also Quintel Corp.,* 567 F.Supp. at 1360. Here though, we do not consider relevance in the context of the Federal Rules of Civil Procedure, as Olympian mistakenly contends. As of yet there is no pending litigation. Instead, we consider relevance in the context of Fed.R.Bankr.P. 2004 and the Rule 2004 Order, the very source of the present controversy. It is this relevance that the Trustee has failed to demonstrate, and for this reason his Motion fails.

The goal of the Rule 2004 Order, as stated by the Trustee, was to enable the Trustee to determine what steps it should take to maximize the value of the Shares. Plainly, this objective falls well within the broad reach of Fed.R.Bankr.P. 2004. However, the Motion revolves almost exclusively around the Trustee's "potential claim" against Olympian's board of directors. Thus, it appears that instituting an adversary proceeding is the only "step" contemplated by the Trustee. This was confirmed by the Trustee at oral argument. *See Tr. of Hearing on Motion* (July 9, 1996) at 12–13. Unfortunately, the relevance of the documentation and testimony sought to the Trustee's ability to make that determination, i.e. whether or not to institute an adversary proceeding, has not been articulated by the Trustee. The Trustee makes much about the importance of these communications in discerning Olympian's intentions in enacting the Resolutions, Agreements and Plan and indeed, such intentions may become relevant in the ultimate resolution of litigation the Trustee may decide to initiate. Nevertheless, this only begs the question: why is knowledge of this intent necessary for the Trustee to decide whether or not to institute an adversary proceeding in the first instance? The Trustee is mute in this regard and that question remains unanswered.[3] Accordingly, there is no countervailing policy which would warrant disregarding an otherwise appropriately asserted privilege with respect to any of the documentation or testimony at issue, all of which shall remain protected from disclosure.[4]

■■■ Having distilled and disposed of the significant legal arguments asserted herein, we now address the residue. The Trustee's assertion that Mr. Conti waived his right to assert attorney-client privilege is without merit. It is true that "the attorney-client privilege cannot at once be used as a shield and a sword" and that it "may implicitly be waived when [a party] asserts a claim [or defense] that in fairness requires examination of protected communications." *United States v. Bilzerian,* 926 F.2d at 1292; *see also In re von Bulow,* 828 F.2d 94, 101–02 (2d Cir.1987). Further, testimony as to part of a privileged communication constitutes a waiver of the privilege as to the remainder.

---

3. The Trustee's general protestations at oral argument that he is being careful before commencing a lawsuit, while laudable, is plainly insufficient.

4. As a consequence of our ruling that the attorney-client privilege will not be pierced, we need not address Olympian's assertions of work-product privilege, which it raised as an alternative means of protecting from disclosure some of the documentation at issue.

*See In re von Bulow,* 828 F.2d at 102. However, the Trustee has set forth no cognizable basis that would justify his assertions of waiver under either theory. Mr. Conti's testimony that he signed his Agreement on advice of counsel would seem to have no bearing on the defense of any claim against him or Olympian that, in fairness, would warrant disclosure of the substance of that advice. Moreover, there is no litigation, at the present time. Further, Mr. Conti's statement can hardly be deemed a disclosure of a portion of a privileged communication, but rather an acknowledgment that a privileged communication exists. Accordingly, we decline to find the privilege waived.

■■■■ Finally, we address the somewhat distasteful controversy surrounding the testimony of Mr. Myers. We will accept as true that Olympian suggested Mr. Myers' Bankruptcy Rule 2004 examination be postponed pending judicial resolution of the Motion. Likewise, we will accept as true that the Trustee insisted the examination proceed, if only for the purpose of determining the extent of Mr. Myer's assertion of privilege. At first glance, both seem to be reasonable positions. Unfortunately, both positions were taken in plain ignorance of the proposition that the attorney-client privilege may be waived only by the client and not by the attorney. *See In re von Bulow,* 828 F.2d at 100–01; *Republic Gear Co. v. Borg–Warner Corp.,* 381 F.2d 551, 556 (2d Cir.1967) (citing 8 Wigmore, Evidence § 2321, p. 629 (McNaughton rev. ed. 1961) ("[The] privilege is the client's, not the attorney's.")). Thus, absent waiver of the privilege by Mr. Conti (or some other authorized official), Mr. Myers could not be compelled to testify as to any privileged communications with his client, Olympian. As the waiver issue would not be resolved prior to Mr: Myers' Bankruptcy Rule 2004 examination, there was little reason for the Trustee to insist the examination go forward. Once the parties did proceed with the examination of Mr. Myers, no purpose was served by Olympian's combative approach taken as a consequence of what it believed was the Trustee's expansive view of the waiver issue. It is hardly surprising that the Supplemental Submissions and the responses thereto had virtually no

substantive impact on this controversy and, in fact, delayed its resolution. In sum, there is no rationale justification for awarding either party's request for costs or sanctions.

## CONCLUSION

We find the Trustee has failed to address the relevance of the documentation and testimony sought herein or to set forth a cognizable basis to support his assertion that a waiver of the attorney-client privilege occurred. We therefore decline to compel disclosure of the documentation and testimony in the face of an otherwise properly asserted attorney-client privilege. Further, the mutual frivolity of the parties' cross-requests for costs and sanctions cancel each other out. Accordingly, the Motion is denied. The cross-requests for costs and sanctions are also denied.