**IN RE: CHINA MEDICAL TECH-NOLOGIES, INC., Debtor in a Foreign Proceeding.**

**Case No. 12–13736 (REG)**

United States Bankruptcy Court, S.D. New York.

Signed December 1, 2014

Klestadt & Winters, 570 Seventh Avenue, 17th Floor New York, NY 10018, By: Tracy L. Klestadt, Esq., John E. Jureller, Jr., Esq., Lauren C. Kiss, Esq., Attorneys for the Foreign Representative

Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, By: Robert A. Atkins, Esq., Stephen J. Shimshak, Esq., and 2001 K Street, NW Washington, DC 20006, By: Claudia R. Tobler, Esq., Attorneys for Paul, Weiss, Rifkind, Wharton & Garrison LLP

AlixPartners LLP, 40 West 57th Street, New York, NY 10019, By: John J. Collins, Esq., Kaitlyn Sundt, Esq., Attorneys for AlixPartners LLP

Chapter 15

## BENCH DECISION [1] ON PRIVILEGE OBJECTIONS TO LIQUIDATOR'S FED. R. BANKR. P. 2004 SUBPOENA

ROBERT E. GERBER, UNITED STATES BANKRUPTCY JUDGE:

In this contested matter in the chapter 15 case of foreign debtor China Medical Technologies, Inc., a Cayman Islands Corporation ("**China Medical**"), involving a request for documents under Fed. R.Bankr.P.2004 filed by China Medical's Cayman Islands Liquidator, the Foreign Representative here (the "**Liquidator**"), I must determine the extent to which attorney-client privilege, attorney mental impressions, and work product protections (collectively, though work product is not a privilege, the "**Privileges**") associated with legal services for a company's board of directors' *audit committee* devolve to a trustee or liquidator after the company goes into bankruptcy.

It's well established, of course, that when a company goes into bankruptcy, the Privileges of the *company itself* then devolve to its trustee, and the trustee can have full access to the company's protected information.[2] But here the subpoenaed witness Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") provided legal services to China Medical's *Audit Committee*, and subpoenaed witness AlixPartners, LLP ("**AlixPartners**") assisted Paul Weiss.[3] The Liquidator wishes to obtain documents each did not already produce that have been withheld by claims of Privileges. I first need to decide, since China Medical was organized under the law of the Cayman Islands, whether Cayman or U.S. law controls issues as to the applicability of the Privileges. I then need to decide whether, under whichever law is applicable, the Audit Committee must be regarded as separate from China Medical itself, and thus whether the Liquidator's ownership of the Privileges for China Medical as a whole also covers Privileges of the Audit Committee, enabling the Liquidator to have access to documents covered by

---

1. I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

2. *See, e.g., CFTC v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) ("*Weintraub* "). For obvious reasons, I see no meaningful difference, under the facts here, between the rights of a trustee and those of the Liquidator.

3. Paul Weiss and AlixPartners collectively are the "**Subpoenaed Entities.**"

the latter. At my request, the two sides have briefed each of those issues.

For the reasons that follow, I determine, with respect to the first issue, that U.S. law, rather than Cayman law, applies to the issues here. On the second issue, I determine that under U.S. law, the Audit Committee, and not the Liquidator, owns the Privileges.

Thus the Subpoenaed Entities' claims of privilege (to the extent otherwise applicable) must be sustained. To the extent the Subpoenaed Entities' advice, reports or other communications to the Audit Committee were memorialized in writing (assuming, if such came from AlixPartners, that they were created for the purpose of assisting Paul Weiss in providing legal advice), or if, for the purpose of providing legal advice to the Audit Committee, personnel at either Paul Weiss or AlixPartners had communications with company personnel (in the absence of outsiders to the privilege group, of course), documents revealing the substance of those communications will be protected.[4]

*Facts*

Though many of the facts concerning the disappearance of millions of dollars of China Medical's assets remain a mystery, the facts governing this discovery dispute are straightforward.

China Medical is a holding company organized under the law of the Cayman Island that had effective control, through a series of wholly-owned subsidiaries, of operating companies in the People's Republic of China that developed, manufactured and marketed advanced medical technology devices. Between 2005 and 2010, China Medical raised a total of $631 million in the U.S. securities markets, partly in equity securities (in the form of American depositary shares) and partly in notes. The depositary shares were listed on the U.S. NASDAQ.

As a foreign issuer of securities traded on NASDAQ, China Medical was required by NASDAQ rules to establish an audit committee complying with independence requirements set forth under NASDAQ rules. It thus established the Audit Committee here. The Audit Committee had the authority to engage advisors, under each of NASDAQ rules and Sarbanes–Oxley amendments to the '34 Act—which, among other things, require that an audit committee have authority to engage independent counsel and other advisors, as it determines are necessary to carry out its duties.

In 2009, China Medical's former auditor, KPMG Hong Kong, received an anonymous letter alleging that in the two years before that time, China Medical's former management had engaged in a series of suspicious transactions by which China Medical allegedly transferred hundreds of millions of dollars to Chinese companies owned by parties related to China Medical's management, and then channeled some or all of these funds back to China Medical disguised as revenues.[5] The letter made additional allegations of wrongful conduct as well.[6] As a result of the anony-

---

4. However, as discussed below, there are matters as to which the protections—even when they otherwise might exist—don't apply. And the Liquidator has made much more than a sufficient showing for disclosure of material that is merely work product.

5. According to the letter, the same allegations were made to the SEC and the Wall Street Journal.

6. Those allegations would suggest fraudulent accounting. They might or might not further suggest misappropriation or theft. For the purposes of my analysis, the distinction doesn't matter.

mous letter, and at KPMG's request, the Audit Committee retained Paul Weiss to investigate the allegations and advise it as to any appropriate further measures. AlixPartners was retained to provide forensic analysis to assist Paul Weiss in that investigation.

Paul Weiss and AlixPartners then conducted on-site visits and interviews in China and collected hard copy and electronic documents from employees and servers of China Medical and its subsidiaries.

Though China Medical raised huge sums in the U.S. securities markets, much of the money thereby raised has disappeared. The Liquidator, in conjunction with a co-liquidator in Hong Kong, has engaged in an international investigation to determine what happened to hundreds of millions of dollars of the money that had been raised. Although China Medical's public disclosures had stated that the fund raising proceeds were supposed to be invested in its subsidiaries in China, investigation to date has indicated that those investments didn't happen, and there are strong indications that the fund raising proceeds were misappropriated.

The Liquidator, on the one hand, and the Subpoenaed Entities, on the other, differ as to the extent to which the areas of inquiry of the Liquidator's present investigation and the Subpoenaed Entities' earlier work overlap. I don't need to decide whether or not they do, however, because I find that the Liquidator's desire for *anything* that the Subpoenaed Entities might

have is both understandable and reasonable, and the degree of overlap doesn't affect the legal issues before me here.

In June 2012, the indenture trustee on China Medical's notes filed a winding-up petition in the Cayman Islands, seeking China Medical's liquidation and the appointment of liquidators to take over China Medical's affairs. The Cayman court granted that petition, and appointed the Liquidator, who now has control over China Medical's affairs. Under legal principles as to which there's no dispute, the Liquidator owns and controls the Privileges of China Medical itself.

Paul Weiss and AlixPartners gathered up very considerable amounts of material, and produced a large volume of documents and their electronic equivalents—what they call a "massive production"—to the Liquidator. But experience teaches us that the volume of documents produced is not by itself indicative of the completeness of a document production, or of the importance of documents that were or weren't produced. Paul Weiss and AlixPartners withheld documents they considered to be subject to the Privileges,[7] occasioning this controversy. The withheld documents were of such apparent importance to each of the two sides that they have expended considerable effort in litigating it. While discovery disputes before me are normally addressed in conference calls after a required Meet and Confer, it became apparent, in the conference call on this matter, that it involved legal issues that merited

---

7.  They include, according to the Subpoenaed Entities, documents generated by Paul Weiss and AlixPartners (as contrasted to others) in connection with the engagement, and email by and among Paul Weiss and AlixPartners relating to the engagement, and by and among Paul Weiss and the Audit Committee and its members.

    Paul Weiss and AlixPartners haven't yet delivered privilege logs. As I'm ruling that the Privileges will be respected to the extent they aren't otherwise inapplicable, I am requiring the preparation of privilege logs for any documents that are withheld. This decision is without prejudice, of course, to the Liquidator's ability to challenge claimed Privileges for any documents listed in the privilege logs, for any of the usual reasons.

briefing. I directed the two sides to give me briefs on the choice of law that would govern the Privileges, and the underlying law with respect to the Privileges' ownership.

## Discussion

To decide these issues, I need first to determine the appropriate choice of law. After deciding whose law should be applied, I then need to determine who owns the Privileges under that law.

## I.

### Choice of Law

■ The two sides initially differ on whether, in determining the standards for application of the Privileges, I should apply U.S. law, on the one hand, or the law of the Cayman Islands, on the other. The Liquidator argues that I should apply the law of the Cayman Islands, under the "Touching Base" Doctrine (discussed below), the "Internal Affairs" Doctrine (also discussed below), and because it is a Cayman insolvency proceeding that the U.S. bankruptcy court is assisting. The Subpoenaed Entities argue in opposition that I should apply U.S. law, contending that the Touching Base Doctrine should be limited to patent cases, the Internal Affairs Doctrine likewise does not apply, and that because the forum is now a bankruptcy court here in the U.S., U.S. law should be applied.

I can't agree with either side in full. I conclude that the Touching Base Doctrine is the most appropriate foundation for the analysis, but that it still favors application of U.S. law.

**8.** The Federal Rules of Evidence apply in cases under the Bankruptcy Code. *See* Fed. R. Bankr.P. 9017 ("The Federal Rules of Evidence ... apply in cases under the Code.");

■ Both sides start their analysis, properly in my view, with Rule 501 of the Federal Rules of Evidence.[8] It provides:

The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise:

- the United States Constitution;
- a federal statute; or
- rules prescribed by the Supreme Court.

But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

■ While an inquiry under Fed. R. Bankr.P.2004 plainly isn't a criminal case (the most common alternative to a civil case), it is not a "civil case" either. There is no pending cause of action that the evidentiary law might affect, and thus there is nothing upon which to gauge a "rule of decision." Rather, a Rule 2004 examination is an investigative proceeding, to be followed by a civil case if, but only if, civil litigation after the Rule 2004 inquiry is warranted.

By reason of that distinction, Chief Judge Bernstein observed in *Asia Global Crossing*:

Even if the Trustee ultimately intends to pursue state law claims, federal law nonetheless controls the privilege. The privilege question arose in the context of the Court's Rule 2004 orders and corresponding subpoenas. An examination under Rule 2004 "is nonadversarial in nature [and] aimed at discovering evidence upon which future causes of action may be based and is therefore governed

*In re Asia Global Crossing, Ltd.,* 322 B.R. 247, 254 (Bankr.S.D.N.Y.2005) (Bernstein, C.J.) (*"Asia Global Crossing"*) (same).

by bankruptcy law rather than state substantive law." Accordingly, where a *subpoena duces tecum* issues pursuant to Rule 2004, the federal common law rules of privilege apply.[9]

It also appears to be undisputed, and in any event I believe, that the common law includes "choice of law" questions.[10]

■ But *Asia Global Crossing* was a chapter 7 case, and neither *Russell,* other cases Judge Bernstein cited,[11] nor others cited by the Subpoenaed Entities here[12] focused on distinctions that might be applicable to a case under chapter 15, where the investigative proceeding in the U.S. is to assist an insolvency proceeding in another country whose own common (or, for that matter, statutory) law of privilege might more appropriately apply. While the principles Chief Judges Russell and Bernstein articulated would dictate that we should not look to the state or other underlying law whose rule of decision could dictate the outcome of a litigated controversy (*e.g.,* the Internal Affairs Doctrine), they are only partly helpful when deciding whether U.S. evidentiary law, on the one hand, or Cayman evidentiary law, on the other, should apply to this investigative proceeding. That is particularly so since, as the Liquidator properly observes, a U.S. chapter 15 case is not a full-blown insolvency proceeding, but rather is ancillary in nature, to be run in the U.S. to assist a primary insolvency proceeding elsewhere—here in the Cayman Islands.

■ So here I think it's more appropriate to go beyond the only modestly helpful precedent and consider the rationale underlying the applicable Privileges. That has been the practice in other cases, principally in patent and trademark cases, where the applicability of the privilege was governed, or potentially governed, by foreign law.[13] Because we don't have a pending litigation, we don't need to worry about the privilege determination affecting the litigation's outcome. But we still need to focus on why privileges exist in the first place. They are to encourage candid communications between counsel and those who confide in counsel,[14] and, as part of that, to respect justifiable expectations of confidentiality.[15]

With that in mind, I think we need to focus not on which nation's *insolvency proceeding* is primary, but rather, which nation, given the nature of the assertedly

---

9. *Id.* at 254–55 (quoting Russell, *Bankruptcy Evidence Manual* § 501.3 at 826 (2004 ed.) ("*Russell* ")).

10. *See, e.g., Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,* 208 F.R.D. 92, 97 (S.D.N.Y. 2002) (Jones, J.) ("*Astra Aktiebolag* ") ("The 'common law' applied under Rule 501 includes 'choice of law' questions.") (quoting *Golden Trade S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 519 (S.D.N.Y.1992) (Dolinger, M.J.) ("*Golden Trade* ")).

11. *See In re Bakalis,* 199 B.R. 443, 448 (Bankr.E.D.N.Y.1996) (Feller, J.) (chapter 7 case); *In re Blier Cedar Co.,* 10 B.R. 993, 998 (Bankr.D.Me.1981) (Cyr, J., then a bankruptcy judge) (chapter 7 case, following an Act Chapter XI case).

12. *See In re Hotels Nevada, LLC,* 458 B.R. 560, 569 (Bankr.D.Nev.2011) (Markell, J.) (chapter 7 case); *Dynamic Fin. Corp. v. Kipperman (In re North Plaza, LLC),* 395 B.R. 113 (S.D.Cal.2008) (Whelan, J.) (chapter 11 case).

13. *See Golden Trade* and *Astra Aktiebolag,* n.10 above.

14. *See, e.g., Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("*Upjohn* ") (purpose of attorney-client privilege "is to encourage full and frank communication between attorneys and their clients").

15. *See id.* ("assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure") (citation omitted).

privileged communications, has the primary interest in the protection of confidential communications with counsel.[16]

That, of course, is in substance what Touching Base analysis dictates. I agree with the Liquidator that the Touching Base Doctrine is appropriate for use here, even in a case that does not involve patents or trademarks, as so many Touching Base cases have. Recent authority supports application of the Touching Base Doctrine more broadly.[17] In *Anwar* (a case involving actions brought by investors attempting to recover losses suffered in the Madoff investment scandal), Judge Maas, with whom Judge Marrero later agreed, concluded—entirely properly in my view—that in the absence of a public policy conflict, when determining which country's law should apply to attorney-client communications, we should apply the law of the country that has the predominant or the most direct and compelling interest in whether the communications should remain confidential.[18] Judge Maas continued

"The jurisdiction with the 'predominant interest' is either 'the place where the allegedly privileged relationship was entered into' or 'the place in which that relationship was centered at the time the communication was sent.'" Thus, American law typically applies to communications concerning "legal proceedings in the United States" or "advice regarding American law," while communications relating to "foreign legal proceeding[s] or foreign law" are generally governed by foreign privilege law.[19]

Here the Audit Committee retained Paul Weiss (and Paul Weiss, in turn, retained AlixPartners) to examine China Medical's compliance with U.S. securities laws under engagement letters governed by U.S. law. None of the activities relating to the Subpoenaed Entities' engagements had anything to do with the Cayman Islands. The documents said to be protected by the Privileges are located in the U.S. The members of the Audit Committee—the client—were located in the U.S., Hong Kong and China, as contrasted to the Cayman Islands.[20]

16. For that reason, I must reject, as excessively formalistic, the Subpoenaed Entities' contention (Subpoenaed Entities' Reply at 7) that I should decline to apply Cayman privilege law merely because "[t]he Federal Rules of Bankruptcy Procedure do not call for rules of discovery and evidence in chapter 15 cases different from those in other bankruptcy cases," and that under Fed. R. Bankr.P. 9017, "[n]o exception for chapter 15 cases exist[s]."

17. *See Anwar v. Fairfield Greenwich Ltd.,* —— F.R.D. ——, 2013 WL 3369084 (S.D.N.Y. Jul. 8, 2013) (Maas, M.J.) (*"Anwar"*); *Anwar v. Fairfield Greenwich Ltd.,* 982 F.Supp.2d 260, 263–64 (S.D.N.Y. Nov. 8, 2013) (Marrero, J.) (overruling objections to Judge Maas' recommendation).

18. —— F.R.D. at ——, 2013 WL 3369084 at *1 (citing *Gucci America, Inc. v. Guess?, Inc.,* 271 F.R.D. 58, 64–65 (S.D.N.Y.2010), a trademark infringement case).

19. *Id.*

20. It appears, under the facts as presented to me, that there were some aspects of this that touched on neither the U.S. nor Cayman. For example, the interviews conducted with the Company's personnel took place in Hong Kong and China, and documents were collected from custodians and equipment located in Hong Kong and China. But these do not warrant application of Cayman law any more than they warrant application of U.S. law, and in the case of the latter, it appears that documents gathered in Hong Kong and China were also analyzed, at least in part, in the U.S. In any event, China Medical documents gathered by the Subpoenaed Entities are likely, if not plainly, discoverable in any event. Here we are talking about documents subject to Privileges.

Thus, measured by the *Anwar* indicia, the U.S. has by far the predominant interests. The allegedly privileged relationship was entered into in the U.S. And the relationship was centered in the U.S. at the time the communication was sent. The communications concerned legal proceedings in the U.S., and involved American law. There is no indication, on this record, that the communications or attorney mental impressions underlying the Privileges claims involved Cayman law in any way.[21]

I assume that Cayman has its own interest in consideration of the Privileges because of its underlying liquidation proceeding. But that interest is nevertheless trumped, in my view, by the much more extensive U.S. interests in protection of the Privileges that I just noted—especially in light of the remarkable extent to which they match up against the *Anwar* indicia. The confidential communications took place at a time before the winding-up proceeding had come into being. They took place when China Medical had no material

(if any) business dealings in the Cayman Islands; no parties to communications there who might have expectations of confidentiality; and no professionals there with responsibilities to protect their clients' confidentiality rights.

■ Thus I believe that under the facts here, U.S. Privileges law should here apply, even though this chapter 15 case is assisting an insolvency proceeding in the Cayman Islands.[22] Given the locale of Paul Weiss' engagement, and the nature of the advice it was retained to render, the expectations of confidentiality here have a much closer nexus to the U.S. than they do to the Cayman Islands. Looking to the communications and mental impressions to be protected, the U.S. has a much greater interest in the application of its laws.

## II.

### Ownership of the Privilege

■ Now that I've concluded that I should apply U.S. law, I then need to

---

21. Of course, China Medical was organized under Cayman law, and Cayman would have interests in the application of its law, under the Internal Affairs Doctrine, if litigation against China Medical's officers or directors were later commenced. But litigation of that character has not yet been commenced, if it ever will be, and here were are talking about *Privileges*, in the context of an investigative request under Bankruptcy Rule 2004. For the reasons Chief Judges Russell and Bernstein noted, with respect to Rule 2004 examinations, issues as to the Privileges in a 2004 environment are not governed by the underlying legal rules that might apply if and when future litigation were later brought.

I also note that the Liquidator alleges that the Subpoenaed Entities' investigation also covered "questions of whether [China Medical's] management had properly discharged their duties to [China Medical] and its shareholders, all matters of Cayman Islands law." (Liquidator Opening Br. at 11). I don't rule this out—even though, if, as stated, China Medical was potentially putting out false financial statements to U.S. investors, and Paul

Weiss was investigating this, the principal victims of this would be the investors, and not China Medical itself, and their claims would not be governed by the Internal Affairs Doctrine. But even so, any residual areas of inquiry that might be governed by the Internal Affairs Doctrine would once again be insufficient to trump the remaining matters discussed above.

22. Of course, because this is largely a fact-driven inquiry, this analysis does not necessarily suggest the conclusion that U.S. law will *always* apply to future Privileges determinations in chapter 15 cases. I assume that in future cases, courts will focus on matters similar to those I considered here—where legal counsel were retained; where privileged communications took place; whose law was the subject of the advice; and, more generally, which jurisdiction has the stronger interest in protection of the confidentiality of any communications or attorney mental impressions at issue.

determine who owns the Privileges, China Medical or the Audit Committee—it being recognized, once again, that if China Medical is the owner of the Privileges, ownership of the Privileges devolved to the Liquidator under principles that no one can dispute.

The Subpoenaed Entities argue that Judge Casey's decision in *BCE West*[23] is "on all fours with this case."[24]  *BCE West*, they note, holds that an independent committee that retains its own counsel is separate and distinct from the company and its board of directors, and enjoys its own privileges that cannot be waived by the company or its directors or devolve to a bankruptcy trustee.

The Liquidator responds by arguing that, as a factual matter, here the Audit Committee lacked the separateness (and impliedly, the independence) that the Subpoenaed Entities contend that it did (and was no more than a committee of China Medical's Board of Directors), and that *BCE West* is distinguishable for that reason.

I can't agree with the Liquidator here, in major part because I disagree with the Liquidator's factual premise that the Audit Committee here was not independent. And given the existing law on point, *BCE West* (which I agree is directly on point), I believe I must rule that the Audit Committee has to be regarded as an entity separate from the remainder of China Medical, and that when China Medical's Privileges

rights devolved to the Trustee, the Audit Committee's Privileges did not do likewise.

First, with respect to the underlying facts, the Subpoenaed Entities note that the Audit Committee was established to comply with NASDAQ listing requirements that required China Medical to have an independent audit committee with the authority to engage its own advisors, and that otherwise satisfied Sarbanes–Oxley requirements.  They argue that if the Audit Committee lacked the ability to protect confidences like those embodied in the Privileges, an independent committee could never achieve true independence.  It would lack the separateness that Congress deemed necessary for effective oversight of U.S. corporations issuing securities in the U.S. markets.[25]

The Liquidator responds by quoting the underlying minutes of the Audit Committee and the Articles of Incorporation of China Medical.  He notes that the Audit Committee described itself, in its minutes, as "the Audit Committee of the Board of Directors,"[26] and that the Articles authorized directors of China Medical to "delegate any of their powers to committees," with any committee to exercise "powers so delegated" to "conform to any regulations that may be imposed on it by the Directors."[27]  These documents, the Liquidator argues, indicate that it was not the intent that the Audit Committee be "separate and distinct" from the Board of Di-

---

**23.**  *In re BCE West, L.P.,* 2000 U.S. Dist. LEXIS 12590, 2000 WL 1239117 (S.D.N.Y. Aug. 31, 2000) (Casey, J.) (*"BCE West "*).

**24.**  Subpoenaed Entities' Opening Br. at 13.

**25.**  The Subpoenaed Entities further argue that Cayman law is the same, recognizing the Audit Committee as an entity separate and distinct from China Medical.  By reason of my conclusions in Section I, I don't need to confirm this.

**26.**  *See* Minutes, Liquidator Exh. P.

**27.**  *See* Articles of Incorporation Section 88; *accord id.. See also id.*  Section 91 (authorizing directors to establish committees, local boards or agencies for managing China Medical's affairs, and to appoint any persons to be members of them).

rectors of China Medical or China Medical itself.

I cannot agree with the Liquidator's contentions in this regard. The issue is not, in my view, whether the Audit Committee was in fact a committee of the Board. Of course it was; that is the nature of a committee. The issue is rather whether, once formed, the Audit Committee was given independence, and understandably expected, incident to its independence, to engage in its affairs and communicate with its counsel with confidentiality and protection from the scrutiny and interference of others at China Medical, including the Board itself. I think the Audit Committee was, indeed, given that independence. If it hadn't been, it would have failed to satisfy NASDAQ and SEC rules,[28] and would not have been able to function.

We then turn to whether *BCE West* is in any way distinguishable. I conclude that it is not. In fact, I believe that *BCE West* is closely on point.

There Shearman & Sterling sought to quash or modify a subpoena that had been issued by the trustee (the **"Plan Trustee"**) appointed under the reorganization plan in the *Boston Chicken* chapter 11 case.[29] The subpoena sought documents relating to Shearman & Sterling's representation of

a special committee of Boston Chicken's Board. In connection with proposed restructuring transactions, the Boston Chicken Board had passed a resolution establishing the Special Committee (composed of two non-interested outside directors), whose purpose was to investigate, among other things, whether Boston Chicken should pursue and enter into certain acquisition transactions.

The board resolutions establishing the Special Committee provided that the Special Committee had the authority to retain its own counsel and other experts that it deemed appropriate, and the Special Committee retained Shearman & Sterling as its independent counsel. Shearman & Sterling communicated extensively with the Special Committee and with Wasserstein, Perella, the financial advisor to the Special Committee, and Cravath, which advised Wasserstein, Perella. (Boston Chicken and its Board of Directors were represented by other counsel.)

The Special Committee ultimately recommended the restructuring proposal and the acquisition transaction was consummated. But after these events, Boston Chicken fell into chapter 11. After his appointment, the Plan Trustee argued that he had the ability to waive the attorney-

---

**28.** For instance, in SEC Release No. 33–8220, 2003 WL 1833875 ("Release 33–8220"), the SEC stated that as directed by Sarbanes–Oxley, it was adopting a new rule to direct the national securities exchanges and national securities associations to prohibit the listing of any security of an issuer that was not in compliance with the audit committee requirements mandated by Sarbanes–Oxley. Among other things, these requirements related to the independence of audit committee members, the authority of the audit committee to engage advisors, and funding for any outside advisors engaged by the audit committee. It stated:

> To perform its role effectively, therefore, an audit committee may need the authority to

engage its own outside advisors, including experts in particular areas of accounting, as it determines necessary apart from counsel or advisors hired by management, especially when potential conflicts of interest with management may be apparent.

*Id.* at *19.

**29.** Boston Chicken was reorganized in the District of Arizona. Under familiar principles, the motion to quash or modify the subpoena was brought and heard in the Southern District of New York, where compliance was required. *See* Fed.R.Bankr.P. 9016; Fed. R.Civ.P. 45(d)(3).

client privilege on behalf of the Special Committee.

But Judge Casey disagreed. He noted that the board's resolutions had expressly provided that the Special Committee could retain counsel independent from the counsel representing the company, and observed:

> It is counterintuitive to think that while the Board permitted the Special Committee to retain its own counsel, the Special Committee would not have the benefit of the attorney-client privilege inherent in that relationship or that the Board of Directors or management, instead of the Special Committee, would have control of such privilege. The attorney-client privilege, therefore, applied to and protected the confidential communications between the Special Committee and Shearman & Sterling.[30]

Judge Casey then turned to whether, under *Weintraub,* the Plan Trustee could waive Boston Chicken's attorney-client privilege with respect to the pre-bankruptcy communications. He recognized that under *Weintraub,* the Plan Trustee would then control the corporation's privilege, but that others' privileges would still be applicable against the trustee.[31] He continued:

> To the extent that the Special Committee members acted in their capacity as members of the Board of Directors, any representation of the Board of Directors may be waived by the Plan Trustee, however, any advice sought or provided in connection with the Special Committee's duties, responsibilities, actions or any other advice sought or provided in connection with the Special Committee,

is privileged. Because the Special Committee is a separate and distinct group from the Board of Directors, with separate legal representation, the privilege afforded it is not the privilege of the corporation, but rather, is the privilege of the Special Committee. Accordingly, the Plan Trustee cannot waive it.[32]

Here the China Medical Articles of Incorporation do not, so far as the record reflects, expressly say that China Medical's committees (or its Audit Committee, in particular) could hire separate counsel, and in this respect *BCE West* is different than the case here. And it appears that China Medical's Audit Committee had been established before the investigation in question here, and was not formed solely for this investigative purpose. But I can't find either distinction to be a sufficiently meaningful basis to distinguish this case from that one. First, the Audit Committee *did* retain counsel, and there is nothing in the record to suggest that anyone thought that was unauthorized. And second, the SEC and NASDAQ *required* that the Audit Committee have the authority to hire independent counsel. There is no reason to believe that China Medical's Audit Committee had less authority to hire independent counsel than Boston Chicken's Special Committee did.

*BCE West,* a decision of a district court in this district, is not binding on me, and if I thought it were incorrectly decided, I would not need to follow it. But I think it is correct. As the SEC observed in Release 33–8220, audit committees need the ability to consult counsel apart from those serving the Board or management, as conflicts between the audit committee and

---

**30.** *BCE West,* 2000 U.S. Dist. LEXIS 12590 at *4, 2000 WL 1239117 at *2.

**31.** 2000 U.S. Dist. LEXIS 12590 at *5–6, 2000 WL 1239117 at *2.

**32.** 2000 U.S. Dist. LEXIS 12590 at *6, 2000 WL 1239117 at *2.

others at the company may exist. Audit committees can't have others at the company looking over their shoulders, and need to be able to consult with independent counsel, with confidentiality, if they are to do their jobs without interference.

I've come to this view even though one can argue that once any miscreants have left the company, and the fox is no longer guarding the chicken coop, the need for confidentiality no longer exists. *BCE West* did not address this possibility, and that decision was unclear as to whether or not any prospective targets of litigation were still at Boston Chicken when the Plan Trustee there took over. But whether or not miscreants still have the power to interfere with the work of an audit committee or other independent committee, I think that on balance I should still follow *BCE West.* Ensuring candid discussions between client employees and counsel requires confidence, on the part of each (but especially on the part of the client employees), that confidential communications will be protected. And that requires predictability. I think I would destroy that predictability if those communicating with counsel in confidential communications would justifiably fear that communications in confidence would not later be protected. And if I were not to follow *BCE West,* I think I would impair or destroy that predictability. I will follow *BCE West* here. Though doing so impedes the Liquidator in his legitimate desire to discover the truth, it is important that company employees talk openly and honestly to the audit committees of the world, and I don't want to do anything that might impede their candor in that regard.

## III.

### Exceptions?

That leads us to where we go next. I see nothing in my rulings here that should impede the Liquidator's access to documents, from China Medical personnel or others, that Paul Weiss and AlixPartners gathered up. Though I'm not addressing, one way or the other, whether any other protections from disclosure might apply, the starting point for any analysis should be that they are not protected under this decision.

Likewise, I see this decision as principally protecting communications protected under the attorney-client privilege and attorney mental impressions. While in the first instance, it also covers work product, we all know that there are exceptions to the work product doctrine, especially when the information is not available by other means. This decision is without prejudice to the Liquidator's rights to establish exceptions to work product protection as well.

The Subpoenaed Entities are to ensure that all documents not protected under this decision have been produced or promptly will be, and are now to prepare the necessary privilege logs. The two sides are then to meet and confer to resolve or narrow any remaining differences.

I would hope that the remaining disclosure will now proceed smoothly, but if it does not, the two sides' rights will be reserved.